UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MILDRED E. RIVERA,                                    :

                      Plaintiff,                    :          11 Civ. 07469 (LTS) (DF)

      -against-                                    :          **REPORT AND**
                                                                         **RECOMMENDATION**
                                                              :
MICHAEL J. ASTRUE, Commissioner
of Social Security,                                   :
                        Defendant.
------------------------------------------------------------X

**TO THE HONORABLE LAURA T. SWAIN, U.S.D.J.:**

      Plaintiff Mildred Rivera ("Plaintiff") seeks review of the final decision of Administrative

Law Judge ("ALJ") Davis S. Pang in favor of defendant Michael J. Astrue, the then-

Commissioner of Social Security ("Defendant" or the "Commissioner"),[1] denying Plaintiff

Supplemental Security Income ("SSI") under the Social Security Act (the "Act") on the ground

that Plaintiff's impairments did not constitute a disability for the purposes of the Act.  Defendant

has moved pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the

pleadings affirming the decision of the ALJ (Dkt. 17), and Plaintiff has cross-moved for

judgment on the pleadings reversing the ALJ's decision (Dkt. 25).

      For the reasons set forth below, and so as to permit full review, I recommend that the

case be remanded for further proceedings.

---

[1] It is this Court's understanding that Michael J. Astrue no longer holds the position of Commissioner of Social Security, and that, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner.

## BACKGROUND[2]

### A.      Plaintiff's Personal and Employment History

Plaintiff was born on October 17, 1965 (R. at 59), and completed schooling through the eighth grade (*id.* at 32, 186).  It appears that Plaintiff worked briefly at some point in the 1990s and again in 2004.  (*See id.* at 28, 41-42, 46.)[3]  Based on her testimony before the ALJ, Plaintiff worked in the 1990s as a cashier clerk at a store (*id.* at 41-42, 46), and, in 2004, she worked for less than a year at a clothing store called Freddie's, where she hung up clothing (*id.* at 28).[4]  In connection with her 2009 application for SSI, Plaintiff claimed that her disability actually began on January 1, 2004 (*id*. at 168, 170, 181), and that she was unable to work for a variety of reasons, both physical and mental (*see id*. at 181).  At her hearing in August, 2010, she claimed, in particular, that she could not work due to lower back and knee pain, high blood pressure, asthma, arthritis, and bipolar disorder.  (*See id.* at 30, 32-34.)

---

[2] The background facts set forth herein are taken from the administrative record (referred to herein as "R."), which includes, *inter alia,* Plaintiff's medical records and the transcript of the August 19, 2010 hearing held before the ALJ, at which Plaintiff testified.

[3] At the administrative hearing held in this case, Plaintiff testified that she worked in the early 1990s and 2004 (*id*. at 28, 41-42, 46), but the Court notes that, in forms Plaintiff submitted to the SSA in connection with her application for benefits, she listed her work history as 1998-2000 and 2004 (*see id.* at 182-83, 189-90).  Further, where those forms required her to describe the nature of that work, Plaintiff responded "unknown" and "unable to recall due to my medical condition."  (*Id.*)

[4] This description of Plaintiff's prior employment is inconsistent with information she appears to have provided her treating psychiatrist and therapist, who reported, in 2009, that Plaintiff's last full-time job had been as a cashier in a gas station (when Plaintiff was in her 20s), and that her last employment of any kind had been part-time maintenance work, which she did for several years in her mid-late 30s.  (*See infra*, at Background, Part B(2)(b).)  It is also inconsistent with the information Plaintiff apparently provided to a consulting psychiatrist, who reported, also in 2009, that Plaintiff had last worked in 2003, as a housekeeper.  (*See infra*, at Part B(4)(a).)

At the time of the administrative hearing in this case, Plaintiff was living on welfare with her two daughters, then-ages 10 and 18, in a two-story walk-up apartment.  (*Id.* at 29-30, 33.) Her typical daily activities included taking care of her children and their two cats, cooking, doing laundry, dusting, cleaning, and resting.  (*Id.* at 30, 34; *see also id.* at 197-98 (New York State disability form, dated Aug. 26, 2009).)  In applying for disability benefits in 2009, Plaintiff wrote that she spent two to three hours preparing meals, which she did on an "almost" daily basis.  (*Id.* at 198.)  At the hearing, the ALJ asked if Plaintiff needed help with the cooking and laundry, and Plaintiff said that she only needed help with the cooking sometimes "to stir the rice and stuff," and that she could not "lift heavy objects."  (*Id.* at 30.)  Plaintiff had a washing machine in the house and air dried her clothing on racks.  (*Id.* at 34.)  In applying for benefits, Plaintiff reported that she did not need anyone to help her with household chores (*id.* at 199), but, at the administrative hearing, she testified that her daughter helped her with chores because of Plaintiff's arthritis in her hands and knees (*id.* at 30, 34).

Plaintiff testified that she went outside about once a week and traveled using public transportation.  (*Id.* at 29, *see also id.* at 199.)  She stated that she did not like going out because she could not be around a lot of people.  (*Id.* at 199.)  In her application, Plaintiff reported that she could go out alone (*id.*), but, at the administrative hearing, Plaintiff testified that a friend had helped her take the train to get to the hearing (*id.* at 29).  Once a month, Plaintiff shopped with her daughter for food and school supplies, and sometimes she had groceries delivered.  (*Id.* at 33, 200.)  Plaintiff did not use a savings account or checkbook, but she did manage her own finances.  (*Id.* at 200.)  Plaintiff did not socialize, but she enjoyed watching television and listening to music and did so on a daily basis.  (*Id.* at 34, 197, 200-01.)

In describing the circumstances under which she had lost her last job (at the clothing

store "Freddie's"), Plaintiff explained that she was fired because the store was overstaffed (*id*. at

28-29); she stated that the manager was very nice to her, and, to her knowledge, she was never

written up or told by her boss that she was doing a bad job (*id*. at 29).  Indeed, in her application

for benefits, Plaintiff wrote that she had never had any problems getting along with people in

authority and that she had never lost a job because of problems getting along with people.  (*Id.* at

202-03.)  Plaintiff testified, though, that she used to get into fights with the customers at

Freddie's (*id.* at 32), and that that she would no longer be able to handle that job because she

"can't be around people" and gets "aggressive" (*id.* at 31-32).

Plaintiff reported having had bipolar disorder and depression for as long as she could

remember, but that these conditions had been "bad" since 2004.  (*Id.* at 185.)  As of the hearing

date, Plaintiff had been receiving psychiatric treatment for two years.  (*Id.* at 36.)  Plaintiff saw

her psychiatrist once a month and her therapist once a week.  (*Id.*)  She testified that she took her

medication, but still experienced symptoms.  (*Id.*)  Plaintiff said that sometimes she would get so

depressed that she would "stay in bed all day," and that sometimes this feeling would last more

than one day.  (*Id.*)  In her application, Plaintiff indicated that she could follow both written and

spoken instructions (*id.* at 202), but she also wrote that she had problems paying attention and

that she could not finish what she started because she would "forget or get too tired" to finish

(*id.*; *see also id.* at 38).  Plaintiff also indicated that she did not react well to stress or changes in

a schedule and that she had trouble remembering things.  (*Id.* at 203.)

With respect to her physical problems, Plaintiff testified that she had bad pain "four to

five days" a week, and that, when her pain was bad, she could not do her normal daily activities

(cooking, cleaning, etc.).  (*Id.* at 34.)  In her application form, Plaintiff reported that she

4

experienced lower back pain "every month"; that this pain could last for weeks; that the pain changed over time; and that, at the time of her application, it was "OK."  (*Id.* at 204-05.) Plaintiff stated that she took Naproxen for pain, which provided some relief and no side effects, and that she wore a brace.  (*Id.* at 37, 205-06.)  Plaintiff also testified that, when she cleaned, she would get "bad asthma attacks" and that a recent attack had required an emergency room visit. (*Id.* at 35.)  Plaintiff testified that she used a nebulizer three times a week and that, when she went to the emergency room, she was given Prednisone.  (*Id.*)  She stated that she sometimes experienced dizziness from her medication, as well as fatigue or trouble sleeping.  (*Id.*)

According to Plaintiff, she could walk only two blocks at a time before needing to rest for 10 to 15 minutes (*id.* at 202, 33), but she could climb the two flights of stairs to her apartment without difficulty (*id.* at 33).  At the hearing, Plaintiff testified that she could not sit very long and that she had to rock back and forth so that she did not feel as much pain.[5]  (*Id.*)  At the conclusion of her testimony, however, Plaintiff indicated that she was probably physically fit to perform a regular, eight-hour-a-day job with little exertion,[6] even though, mentally, she did not think she was capable of working.  (*Id.* at 37.)

**B.    Medical Evidence**

The medical evidence in the record before the ALJ was not complete.  First, although Plaintiff had reportedly last worked in 2004, it appears that the earliest medical records in the

---

[5] Plaintiff's attorney requested that the record reflect that Plaintiff rocked during the administrative hearing.  (R. at 33.)

[6] In particular, the ALJ asked Plaintiff whether she could handle a job that was "eight hours a day, five days a week with a fifteen minute break in the morning, one hour break at noon, another fifteen minute break in the afternoon moving simple objects from point A to B weighing no more than ten pounds."  (R. at 37.)

administrative record date back only to the fall of 2008.  Second, as discussed further below, the

record before the ALJ did not include treatment notes from Plaintiff's psychiatrist and

psychologist.  The medical evidence contained in the administrative record can be summarized

as follows:

> **1.      Bronx Lebanon Hospital:**
> **F.E.G.S. Biopsychosocial Evaluation**

Over a two-week period in September of 2008, Plaintiff underwent a F.E.G.S. Health and

Human Services ("F.E.G.S.") [7] biopsychosocial ("BPS") evaluation, consisting of a series of

assessments by professionals (including a social worker, two physicians, and a case manager) at

Bronx Lebanon Hospital.  (*Id*. at 217-29.)  In their assessments, described below, these

professionals considered a range of Plaintiff's symptoms (both physical and psychiatric) and

made certain treatment recommendations.

> **a.      Interview with Social Worker Netanya Bell**

On September 10, 2008, as the first part of the F.E.G.S. evaluation, Plaintiff was

interviewed by Social Worker ("SW") Netanya Bell.  (*Id*. at 220-24.)  It appears that Plaintiff

traveled independently to the appointment by bus.  (*Id.* at 223.)

SW Bell asked Plaintiff a series of questions about her lifestyle, including questions that

sought information about any history of family violence and/or substance abuse.  (*Id.* at 220-21.)

Plaintiff reported that, for 13 years, she had been in an abusive relationship with the father of her

daughters, but that she felt safe in her current living arrangements and did not need any services

---

[7] The mission of F.E.G.S. is "[t]o meet the needs of the Jewish and broader community
through a diverse network of high quality, cost-efficient health and human services that help
each person achieve greater independence at work, at home, at school and in the community, and
meet the ever-changing needs of business and our society."  *See* http://www.fegs.org/about/
about_fegs (last visited Apr. 3, 2014).

related to domestic violence.  (*Id.* at 220.)  Plaintiff denied a history of substance abuse

problems, although she did report that she used marijuana on a daily basis.  (*Id.* at 221.)  Plaintiff

said that she had smoked cigarettes for more than 10 years, and that she smoked under a pack a

day.  (*Id.* at 225.)

SW Bell also inquired about Plaintiff's mental health history and status.  Plaintiff

reported that she had last seen a psychiatrist in 2003, for depression, but SW Bell found that,

with respect to her mental health history, Plaintiff was not a reliable historian.  (*Id.* at 222.)  With

respect to current symptoms, Plaintiff reported that, within the two weeks prior to the interview,

she had felt depressed, had trouble sleeping, felt bad about herself, and had trouble

concentrating.  (*Id.*)  In response to a question, though, as to how difficult these problems had

made it for Plaintiff "to do [her] work, take care of things at home, or get along with other

people," Plaintiff indicated that they did not make such tasks difficult at all.  (*Id.*)  Plaintiff

denied having little interest or pleasure in doing things, feeling tired or having low energy,

having a poor appetite or overeating, having suicidal thoughts, or having auditory or visual

hallucinations.  (*Id.* at 222-23.)  Overall, based on her answers to questions posed to her by

SW Bell from a "Patient Health Questionnaire (the "PHQ-9") (a questionnaire used by F.E.G.S.

as a screening tool for depressive syndromes (*id.* at 257)), Plaintiff received a score of "4,"

which indicated "normal or minimal depressive symptoms" (*id.* at 257-58, 223).

Plaintiff reported to SW Bell that she was able to wash dishes, wash clothes, sweep/mop

the floor, vacuum, watch TV, make beds, shop for groceries, cook meals, read, socialize, get

dressed, bath, use the toilet, and groom herself.  (*Id.* at 223.)  Plaintiff also reported that she

enjoyed music and had contact with friends and family.  (*Id.*)  SW Bell identified Plaintiff's

strengths, including that Plaintiff was compliant with treatment and/or medications, had home

management skills, had leisure skills, had work skills/history, maintained adequate

grooming/hygiene, maintained housing, had not had psychiatric hospitalizations, successfully

participated in New York's Human Resources Administration ("HRA")[8] work activities, and

traveled independently.  (*Id.* at 224.)  SW Bell wrote, though, that Plaintiff saw her physical

problems (*i.e.*, fibroids, asthma, hypertension, and arthritis), as well as her on-and-off depression,

as barriers to employment.  (*Id.*)

### b. <u>Physical Evaluation by Dr. Rama Kompella</u>

As part of Phase I of the F.E.G.S. BPS evaluation, Plaintiff was also given a physical

examination, on September 17, 2008, by Dr. Rama Kompella.  (*See id.* at 226-28.)  All of

Dr. Kompella's findings from this examination were normal, except that Plaintiff reported "TTP

[tenderness to palpation]" at the L5-S1 region of her lower back.[9]  (*Id.* at 227.)  A "SLR [straight

leg raise] test," however, produced negative results.[10]  (*Id.*)  Plaintiff told Dr. Kompella that her

---

[8] HRA, among other things, "provides temporary help to individuals and families with social service and economic needs to assist them in reaching self-sufficiency."  *See* http://www.nyc.gov/html/hra/html/about/about.shtml (last visited Apr. 3, 2014).

[9] The "L5-S1" is "the segment where the lumbar spine meets the sacral region." *See* http://www.spine-health.com/conditions/spine-anatomy/normal-spinal-anatomy  (last visited Apr. 3, 2014).  The sacral region is "located below the lumbar spine, the *sacrum* is a series of 5 bony segments fused together (known as S1 to S5) that create a triangular-shaped bone that serves as the base of the spine and makes up part of the pelvis."  *Id.*

[10] A "straight leg raise test" or SLR indicates the severity of an individual's low back pain and whether it may be caused by a herniated disc.  *See generally* http://www.webmd.com/a-to-z-guides/straight-leg-test-for-evaluating-low-back-pain-topic-overview (last visited Apr. 3, 2014).  If a patient has pain down the back of her leg below the knee when the leg is raised, the test is positive (abnormal).  *Id.*  If doing this test on the patient's unaffected leg causes pain in the patient's affected leg, it is more likely that the patient has a herniated disc.  *Id.*

pain ranged from 2 to 8, where 0 would have represented no pain.  (*Id.*)  Dr. Kompella recommended that Plaintiff receive a follow up examination with a psychiatrist.[11]

**c.**       **Psychiatric Evaluation by Dr. Jorge Kirschtein**

Dr. Jorge Kirschtein, a psychiatrist, performed a Phase II BPS evaluation of Plaintiff on September 24, 2008.  (*Id.* at 248-55.)  Plaintiff told Dr. Kirschtein that she had a mental health impairment due to "mood swings and anxiety."  (*Id.* at 249.)  Plaintiff again reported that she was last treated for mental health problems in 2003, and she denied past psychiatric hospitalizations, or suicide/homicide attempts.  (*Id.* at 250.)

With respect to Plaintiff's alleged mood disturbances, Dr. Kirschtein noted that Plaintiff reported both depression and manic episodes – in each case, with an onset when she was in her teens.  (*Id.*)  Plaintiff reported experiencing depression about five days per week with symptoms of a "sad mood, social isolation, poor concentration, low energy, disturbed sleep, disturbed appetite, anhedonia, helplessness, worthlessness, and guilt."  (*Id.*)  Dr. Kirschtein wrote that Plaintiff's manic episodes typically involved "racing thoughts, increasing rapid speech, elation, irritability, expansiveness, grandiosity, poor sleep for several days, and distractibility."  (*Id.*)  Plaintiff denied experiencing auditory or visual hallucinations, "except fleeting shadows."  (*Id.*)

As to Plaintiff's purported anxiety, Dr. Kirschtein noted that Plaintiff reported "limited symptom[s]" of panic attacks, which she would experience "inside and outside of [her] home without anticipatory anxiety."  (*Id.*)  Plaintiff reported that the panic attacks triggered anger, and Dr. Kirschtein noted that "behavioral change because of panic includes stressful exposure."  (*Id.*)

---

[11] The BPS Phase I evaluation form also indicates that a Phase II Orthopedics exam was ordered, but that this order was in error.  (R. at 229.)

9

Plaintiff denied agoraphobia.[12]  (*Id.*)  Plaintiff also reported some symptoms of obsessive-compulsive disorder ("OCD"), including excessive cleaning of approximately one hour a day, excessive grooming, excessive need for symmetry/organization, and indecisiveness.  (*Id.*)  According to Dr. Kirschtein, Plaintiff reported symptoms of impulse control problems, both in childhood and persisting into adulthood; in this regard, Dr. Kirschtein noted:  "procrastination, easy boredom, impatience, inattention to details, poor with follow up, [and] poor with organization," although he also noted that Plaintiff reported at least the last of these symptoms to have improved over time.  (*Id.*)  Plaintiff denied symptoms associated with chronic anger, such as fighting, destroying objects, verbal arguments, or domestic violence, and denied symptoms of intermittent explosive disorder.  (*Id.* at 251.)

        With respect to substance abuse, Plaintiff reported that she had used marijuana two weeks prior to her appointment and had used it intermittently for many years.  (*Id.*)  She stated that she would smoke about two blunts (as well as a quarter of a pack of cigarettes) per day.  (*Id.*)  Plaintiff also reported that she had used cocaine in the past, for many years.  (*Id.*)

        Dr. Kirschtein evaluated Plaintiff's mental status and assessed her appearance as "neat," her activity as "calm," her mood as "labile,"[13] her manner as "cooperative," her thought content as "normal," her speech as "normal," and her form of thought as "logical."  (*Id.*)  He evaluated her mood as "depressed."  (*Id.*)  Dr. Kirschtein also evaluated Plaintiff's functional impairments and wrote that Plaintiff had a "severe impairment," which caused "moderate" limitations in her

---

[12] Agoraphobia is "a fear of being in open or public places."  http://www.merriam-webster.com/dictionary/agoraphobia (last visited Apr. 3, 2014).

[13] A labile mood is one where there is "marked fluctuation of mood."  *See, e.g.*, http://psychcentral.com/encyclopedia/2008/labile-mood/ (last visited Apr. 3, 2014).

ability to follow work rules, accept supervision, deal with the public, maintain attention, relate to co-workers, adapt to change, and adapt to stressful situations.  (*Id.* at 252.)  He diagnosed Plaintiff as having Bipolar Disorder, Attention Deficit/Hyperactivity Disorder, Cannabis Dependence, and Borderline Personality Disorder.  (*Id.* at 253.)  Dr. Kirschtein assessed Plaintiff as having a current Global Assessment of Function ("GAF") of 40 with a GAF of 50 in the past year.[14]  (*Id.*)  In his narrative explanation for his diagnosis, he wrote:  "incipient treatment with severe vocational impairment from bipolar II, PSTD [sic] Panic attacks, and OCD with possible mild residual ADD [*i.e.*, attention deficit disorder] and cannabis abuse."  (*Id.* at 254.)  He recommended weekly psychotherapy and a monthly medication program.  (*Id.*)

### d.    BPS Summary Review with Vanessa Luna

On September 28, 2008, F.E.G.S. case manager and entitlement specialist Vanessa Luna discussed the results of the BPS evaluation with Plaintiff.  (*Id.* at 262.)  At that meeting, Luna told Plaintiff that the physician's assessment and recommendation was that Plaintiff was temporarily unable to work for three months due to low back pain, arthritis, depression, and anxiety.  (*Id.*)

### 2.    North Central Bronx Hospital: Mental Health Treatment by Drs. Bathija and Breslau

Plaintiff received psychiatric treatment in the Outpatient Psychiatry Department at North Central Bronx Hospital ("NCB Hospital") from September 18, 2008 through the date of her

---

[14] The GAF scale, a scale from 0 to 100, may be used to report the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. rev. 2000) ("DSM-IV").  A GAF of 40 means an individual has "some impairment in reality testing or communication," or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Id.* at 34.  A GAF of 41 to 50 means an individual has "serious symptoms" or "any serious impairment in social occupational, or school functioning."  *Id.*

hearing.  (*Id.* at 36, 232-33, 273.)  Plaintiff saw psychiatrist, Jagdish T. Bathija, M.D., on a

monthly basis for her psychopharmacology services, and psychologist Ilana Breslau, Ph.D., on a

weekly basis for psychotherapy.  (*Id.* at 273.)  Although the record does not contain these

treaters' regular progress notes or other weekly/monthly treatment records, it does contain three

separate evaluations they prepared regarding Plaintiff's mental health impairments.  In particular,

in connection with Plaintiff's applications for public assistance and/or disability benefits,

Dr. Bathija completed an evaluation of Plaintiff's symptoms on May 14, 2009, and Drs. Bathija

and Breslau completed joint evaluations of Plaintiff on November 5, 2009 and July 21, 2010.

These three evaluations are discussed below.

### a.  May 14, 2009 Evaluation by Dr. Bathija<br>(for HRA Public Assistance)

On May 14, 2009, Plaintiff saw Dr. Bathija for a psychiatric exam and he completed a

psychiatric examination progress evaluation form, apparently in connection with Plaintiff's

participation in HRA's public assistance program.  (*Id.* at 230-31, 264-65.)  The examination

lasted 20 minutes.  (*Id.* at 230.)  Dr. Bathija summarized that, overall, Plaintiff reported that she

was "doing better" on the current treatment plan and medication, but that she was "NOT stable."

(*Id.*)  He noted that Plaintiff had experienced improvement in her acute symptoms relating to

sleep, her labile mood, and her anger management problems, but that she still had lots of

"stressors" related to "workfare"[15] and to her child being "hyper" at school.  (*Id.*)  Dr. Bathija

---

[15] "Workfare" is "a program in which people must do work in order to receive money
from the government for food, housing, medical costs, etc."  *See* http://www.merriam-
webster.com/ dictionary/workfare (last visited Apr. 3, 2014).  It is a type of "welfare program."
*Id.*

reported that Plaintiff found that one of the medications (Stavzor) had a calming effect on her and that she agreed to try the medication Klonopin.  (*Id.*)

Dr. Bathija evaluated Plaintiff's symptoms on a scale from 0 to 3, where a score of "0" meant the patient was asymptomatic, "1" meant the patient had "mild" symptoms, "2" meant the patient had "moderate" symptoms, and "3" meant the patient had "severe" symptoms.  (*Id.*) Dr. Bathija said that Plaintiff was "asymptomatic," meaning that she had no symptoms, of: delusions, elation/euphoria, apathy/indifference, disinhibition, motor disturbances, nighttime behaviors, appetite/eating problems, self destructive behavior, aggression toward others, and aggression toward property.  (*Id.*)  He evaluated Plaintiff as having "mild" symptoms of: hallucinations, agitation, depression/dysphoria, anxiety, irritability/lability, and insomnia.  (*Id.*) Dr. Bathija did not evaluate Plaintiff as having any symptoms that were "moderate" or "severe." (*Id.*)

Using the multiaxial method of assessment,[16] Dr. Bathija diagnosed Plaintiff as having, on Axis I, bipolar disorder with psychotic features; OCD features; PTSD; agoraphobia with panic disorder; and attention deficit hyperactivity disorder ("ADHD").  (*Id.*)  On Axis III, Dr. Bathija wrote that Plaintiff had hypertension, arthritis, migraines, fibroids, gastroesophageal reflux disease ("GERD"), and bladder urgency.  (*Id.*)  On Axis V, Dr. Bathija assessed Plaintiff

---

[16] The multiaxial system of assessment "involves an assessment on several axes, each of which refers to a different domain of information."  DSM-IV at 27.  Axis I refers to clinical disorders and other conditions that may be the focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions that may be relevant to the understanding or management of the individual's mental disorder; Axis IV refers to psychosocial and environmental problems that may affect the diagnosis, treatment, and prognosis of mental disorders; and Axis V refers to global assessment functioning ("GAF"). *Id.*

as having a current and past GAF score of 71.[17]  (*Id.*)  He noted that Plaintiff was adhering to her medication, and the only side effect was unacceptable weight gain.  (*Id.*)  He prescribed Plaintiff Ambien, Stavzor, Geodon, and Klonopoin Wafers and recommended that Plaintiff continue her current frequency of treatment services to prevent relapse and maintain or improve her level of functioning.  (*Id.* at 230-31.)

In the form he apparently filled out for HRA (*id.* at 264-65), Dr. Bathija referred the agency to the foregoing evaluation (*see id.* at 264).  He also indicated that Plaintiff's condition had not stabilized and explained that, although Plaintiff had made some "significant gains," she was "still symptomatic and ha[d] new stressors."  (*Id.* at 265.)  He estimated that Plaintiff would need another six months of treatment and opined that she was temporarily unemployable for that time period.  (*Id.*)

### b.    November 5, 2009 Evaluation by Drs. Bathija and Breslau (New York State Disability Questionnaire)

On November 5, 2009, Drs. Bathija and Breslau jointly completed a New York State Office of Temporary and Disability Assistance, Division of Disability Determinations questionnaire.  (*Id.* at 319-25.)

On the form, the doctors described Plaintiff's problems upon presentment to the clinic in September 2008, noting that she had complained of mood swings, visual hallucinations, and anger management issues.  (*Id.* at 321.)  They noted that, at that time, Plaintiff's "speech was

---

[17] A GAF of 61 to 70 reflects "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV at 34.  A GAF of 71 to 80 means that, "if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning."  *Id.*

pressured with flight of ideas." (*Id.*)  Plaintiff had reportedly indicated that her older brother had

sexually abused her through age nine, although she had no recollection it.  (*Id.*)  Plaintiff had also

told the doctors that her father was physically abusive to her as a child and that she had a history

of drug use, including cocaine, crack, alcohol, and marijuana, which she had used to self-

medicate.  (*Id.*)  The doctors noted that, according to Plaintiff, she quit all drugs prior to the date

of her initial evaluation.  (*Id.*)

       The doctors indicated their treating diagnoses of bipolar disorder with psychotic features;

PTSD; panic disorder; and a history of polysubstance abuse.  (*Id.*; *see also id.* at 319.)  They

further wrote that Plaintiff's then-current symptoms were "irritability, depression, mood lability,

[and] some visual hallucinations (shadows, 'spirits')."  (*Id.* at 319.)  With respect to Plaintiff's

treatment and response to treatment, Drs. Bathija and Breslau wrote that Plaintiff was "much

better than on presentation to the clinic in 9/2008," but that Plaintiff was "still symptomatic and

not stabilized."  (*Id.*)  They listed her current medications as Geodon, Lorazepam, and Titrating

Lithium E.R.  (*Id.* at 320, 321.)  The doctors indicated that Plaintiff's condition was chronic and

that her prognosis would be reassessed, depending on response, every three to six months.  (*Id.* at

320.)

       The doctors also provided an evaluation of Plaintiff's mental status as of the most recent

examination.  They described Plaintiff as well-groomed and "generally cooperative though easily

angered."  (*Id.* at 322.)  Plaintiff's speech was rapid at times, but showed no signs of any "formal

thought disorder."  (*Id.*)  Plaintiff reported visual hallucinations, and her mood and affect were

irritable and labile.  (*Id.*)  Plaintiff's sensorium and intellectual functions, including attention and

concentration, orientation, memory, information, and ability to perform calculations were all

within normal limits.  (*Id.*)  Plaintiff's insight and judgment were grossly intact.  (*Id.*)

The doctors further described Plaintiff's functional abilities, based on what she had reported to them. (*Id.* at 323.) They said that Plaintiff reported spending most of her day alone at home and that Plaintiff was able to care for herself in terms of cooking and hygiene. (*Id.*) They noted that Plaintiff had recently complained that the arthritis in her hands was making it difficult for her to cook. (*Id.*) The doctors also said that Plaintiff could take public transportation, although she sometimes complained that she had "some paranoia and panic attacks," that she was easily angered, and that she could be provocative in public settings when she perceived others as staring at her. (*Id.*)

When asked to describe any difficulties that Plaintiff would have at work or in a work-like setting, the doctors wrote that Plaintiff had no difficulties at her last full-time job, which they indicated was a job as a cashier at a gas station, held by Plaintiff when she was in her 20s. (*Id.*) They stated that Plaintiff's most recent job had involved her working part-time as a maintenance worker, and noted that she had held that job for several years, in her mid to late 30s, but had discontinued the job because of asthma and arthritis. (*Id.*) They noted that Plaintiff did not report any difficulties in that job either. (*Id.*) Nevertheless, the doctors opined in the questionnaire that Plaintiff was "currently NOT stabilized enough to be able to work." (*Id.* (emphasis in original))

Finally, Drs. Bathija and Breslau provided an assessment of Plaintiff's functional abilities. (*Id.* at 324.) They opined that Plaintiff had no limitations in understanding and memory. (*Id.*) They stated, however, that Plaintiff was limited in her ability to sustain concentration and persistence because she could become distracted or have difficulty following instructions, due to her "mood lability/irritability." (*Id.*) They also stated that Plaintiff was limited in her ability to interact socially, opining that Plaintiff was "easily angered" and that,

16

while she could interact with others "in a limited way," she could have "difficulty following supervisory instruction." (*Id.*)  For the same reasons, the doctors indicated that Plaintiff was limited in her ability to adapt as necessary in a work setting. (*See id.*)

**c.**      **July 21, 2010 Evaluation by Drs. Bathija and Breslau**
**(SSA Medical Source Statement Questionnaire)**

On July 21, 2010, Drs. Bathija and Breslau completed a SSA Mental Medical Source Statement Questionnaire for Plaintiff. (*Id.* at 342.)  The form instructed the doctors to answer a series of questions and "attach all relevant treatment notes and test results" that the source had not already provided to the SSA.  In the questionnaire, the doctors confirmed that Plaintiff continued to see Dr. Breslau weekly for therapy and Dr. Bathija monthly for psychopharmacology. (*Id.*)

For Plaintiff's diagnosis, the doctors wrote that, on Axis I, she had bipolar disorder with psychotic features and PTSD; on Axis III, she had hypertension, arthritis, asthma, migraines, fibroids, GERD, and an overactive bladder; and, on Axis IV, she had "conflict with boyfriend and daughter, brother's illness, and financial problems." (*Id.*)  On Axis V, they assessed Plaintiff's GAF as 65, both at the time of the questionnaire and as her highest assessed score in the past year. (*Id.*)  With respect to Plaintiff's treatment and response to treatment, the doctors wrote that Plaintiff still had "mood lability," but that it was in "better control." (*Id.*)  They also noted that Plaintiff was anxious and moderately depressed. (*Id.*)  They indicated that Plaintiff has been prescribed Stavzor, Geodon, Klonopin, and Benadryl (at night), and reported that Plaintiff's only work-related side effects were "fatigue/drowsiness." (*Id.*)  When asked to describe their clinical findings that demonstrated or supported the severity of Plaintiff's impairment, the doctors wrote, "[Plaintiff] reports anxiety, depression, low energy [and] poor

17

concentration," and noted that Plaintiff could be "easily provoked."  (*Id.*)  The doctors opined

that Plaintiff had a fair prognosis and that they would reassess in a year.  (*Id.*)

As for Plaintiff's functional abilities, the doctors first indicated that Plaintiff did not have

a low IQ or reduced intellectual functioning.  (*Id.* at 343.)  They then completed an overall

assessment of Plaintiff's functional limitations on a scale of "None-Mild" to "Moderate" to

"Marked"[18] to "Severe."  (*Id.*)  They found that Plaintiff had no marked or severe functional

limitations.  (*See id.*)  They opined that Plaintiff had no or mild limitations in her "activities of

daily living" and that Plaintiff had not experienced any episodes of decompensation.  (*Id.*)  They

assessed Plaintiff as being moderately limited in "maintaining social functioning" and in the

domain of "concentration, [p]ersistence or pace."  (*Id.*)

The doctors were also asked to evaluate Plaintiff's ability to do work-related activities in

a competitive work setting, based on their examination of how Plaintiff's mental/emotional

abilities were affected by her impairments.  (*Id.* at 344.)[19]  Drs. Bathija and Breslau checked off

that Plaintiff had either an "Unlimited or Very Good" ability to "[c]arry out very short and

---

[18] The form only defined a marked limitation.  It stated that "[a] marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis."  (R. at 343.)

[19] The Questionnaire asked the doctors to rate Plaintiff's mental abilities on a scale of: "Unlimited or Very Good," "Limited But Satisfactory," "Seriously Limited, But not Precluded," "Unable to Meet Competitive Standards," or "No Useful Ability to Function."  The form defined three of the categories.  As relevant here, the category "Seriously limited, but not precluded" was defined to mean that an individual's "ability to function in this area is seriously limited and less than satisfactory, but not precluded," and that there was a "substantial loss of ability to perform the work-related activity."  (R. at 344.)  The category "[u]nable to meet competitive standards" was defined to mean that the individual "cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting." (*Id.*)

simple instructions" and to "[s]ustain an ordinary routine without special supervision."  (*Id.*)

They felt that Plaintiff was "Limited But Satisfactory," in her ability to "[r]emember work-like

procedures," to "[u]nderstand and remember very short and simple instructions," to "[m]aintain

regular attendance" at work, and to "[r]espond appropriately to changes in a routine work

setting."  (*Id.*)

The doctors opined that Plaintiff was "Seriously Limited, But not Precluded," from:

- maintaining attention for two-hour segments,

- working in coordination with or close to others without being unduly distracted,

- performing at a consistent pace without unreasonable number and length of rest periods, and

- dealing with normal work stress.

(*Id.*)  Finally, the doctors believed that Plaintiff was "Unable to Meet Competitive Standards," in

her ability:

- to complete a normal workday and workweek without interruptions from psychologically based symptoms,

- to accept instructions and respond appropriately to criticism from supervisors, and

- to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes.

(*Id.*)  The doctors estimated that Plaintiff's impairments would cause her to be absent from work

about four days per month (*id.* at 345), and stated that she had an impairment that had either

lasted or could be expected to last at least 12 months (*id.*).

### 3.     NCB Hospital:  Emergency Room Visits and Asthma Treatment by Nurse Practitioner Sara Back

Apart from seeing Drs. Bathija and Breslau of NCB Hospital from 2008 to 2010, for mental health treatment, Plaintiff also apparently visited that hospital, at points during that same period, in connection with certain physical complaints.  Of relevance to her application for benefits, she received, on those visits, some limited evaluation and/or care for asthma and hypertension.[20]

In particular, on July 5, 2009, Plaintiff visited the emergency room at NCB Hospital, with complaints that her asthma was bothering her and that her left knee hurt.  (*Id.* at 274.)  The hospital records indicate that Plaintiff did not have a fever, that her cough was "productive," that she had no chest pain, and that she was "moving air" and speaking in complete sentences.  (*Id.*)

On July 21, 2009, Plaintiff made another unscheduled visit to NCB Hospital, where, this time, she was seen in a clinic by Dr. Munish Luthra, who diagnosed her with "[b]enign essential hypertension."  (*Id.* at 278.)

In August 2010, Nurse Practitioner ("NP") Sara Back, who worked at NCB Hospital, completed two SSA questionnaires for Plaintiff.  (*See id.* at 328-39.)  In one of those questionnaires – a "Pulmonary Medical Source Statement Questionnaire" (*id.* at 326-33) – NP Back indicated that she had seen Plaintiff twice in the asthma clinic, the first time in July 2010. (*See id.* at 328.  In the pulmonary questionnaire, NP Back diagnosed Plaintiff with "moderate persistent asthma" and identified Plaintiff's "mildly reduced pulm[onary] function" as the basis for her diagnosis.  (*Id.*)  She indicated that Plaintiff's symptoms were "shortness of breath,"

---

[20] In addition, on June 15, 2009, Plaintiff went to the NCB Hospital clinic complaining of frequent and painful urination (R. at 276); at that time, she was diagnosed with a urinary tract infection and given a prescription for a medication (*id.* at 277).

"chest tightness," "episodic acute asthma," and "wheezing," and opined that the precipitating

factors were "allergens" and "cold/air/change in weather." (*Id.*) NP Back noted that Plaintiff

had asthma attacks one to two times a year, and that the length of Plaintiff's incapacitation

because of these attacks varied. (*Id.* at 329.) NP Back said that she did not think Plaintiff was a

malingerer, but noted that she had only seen her twice. (*Id.*)

       In her Medical Source Statement, NP Back opined that Plaintiff's symptoms were severe

enough to affect Plaintiff's concentration and attention "frequently" and that Plaintiff was

incapable of even low-stress jobs. (*Id.*) She based her opinion on the fact that Plaintiff was both

asthmatic and bipolar. (*Id.*) NP Back assessed that Plaintiff could walk three to four blocks

without rest; sit up to one hour at a time, and less than two hours total in an eight-hour workday;

stand up to 45 minutes at a time, and less than two hours total in an eight-hour workday; rarely

lift less than 10 pounds; and rarely twist, stoop, crouch, or climb ladders or stairs. (*Id.* at 330-

32.) She also advised that Plaintiff needed to avoid concentrated exposure to all irritants. (*Id.* at

332.) NP Back further indicated her belief that Plaintiff would sometimes need to take

unscheduled breaks to sit down during an eight-hour workday, but she said that it was "unclear"

as to how many breaks or how long the breaks would have to be. (*Id.* at 331.) NP Back further

opined that Plaintiff would likely be absent from work about two days per month. (*Id.* at 332.)

       On the same day that she completed the pulmonary assessment, NP Back also completed

a "Physical Medical Source Statement Questionnaire" (*id.* at 334-39) regarding Plaintiff. (*Id.* at

336-39.) Again, she noted that she had only seen Plaintiff twice and that her opinion was based

on "chart review" and "limited knowledge of [Plaintiff]." (*Id.* at 336, 339.) On this limited

basis, she diagnosed Plaintiff with moderate persistent asthma, hypertension, osteoarthritis,

carpal tunnel syndrome, and bipolar disorder. (*Id.* at 336.) She made positive objective findings

of crepitus,[21] reduced grip strength, abnormal pulmonary function test, and positive clinical signs in the right hand, including "Phalen's [and] Tinnel's sign[s]"[22] and the presence of "Bauchards nodes."[23]  (*Id.*)

In this second questionnaire, NP Back assessed that Plaintiff had the same limitations with respect to sitting, standing, lifting, and posture that she had identified in her pulmonary evaluation, except that she opined that Plaintiff could walk for an hour at any one time, rather than 45 minutes.  (*Id.* at 337.)  She noted that Plaintiff would need unscheduled periods of walking around during the workday and to be allowed to shift positions at will throughout the workday, but that it was "unlikely that [Plaintiff could] even work."  (*Id.*)  NP Back assessed that Plaintiff could grasp, twist, turn objects, perform fine manipulation, and reach for only five percent of the time in an eight-hour workday.  (*Id.* at 338.)  This time, NP Back opined that Plaintiff would be absent from work due to her impairments or treatment approximately three days per month.  (*Id.* at 339.)

---

[21] Crepitus is "the grating of a joint, often in association with osteoarthritis."  Stedman's Medical Dictionary 94470 (27th Ed. 2000).

[22] "Tinel's Sign" is "a tingling sensation felt in the distal portion of a limb upon percussion of the skin over a regenerating nerve in the limb."  *See* http://www.merriam-webster.com/medical/tinel's%20sign (last visited Apr. 3, 2014).  A "Phalen Maneuver" is a "maneuver in which the wrist is maintained in volar flexion; paresthesia occurring in the distribution of the median nerve within 60 sec may be indicative of carpal tunnel syndrome." Stedman's Medical Dictionary 94470 (27th Ed. 2000).

[23]  A "bouchard node" is a bony enlargement of the middle joint of a finger that is commonly associated with osteoarthritis.  *See* http://www.merriamwebster.com/medical/bouchard's%20node (last visited Apr. 3, 2014).

4.      **Consultative Reports**

The administrative record also contains consultative reports by both examining and non-examining professionals.  Both Dr. Herb Meadow, a psychiatrist, and Dr. Barbara Akresh, an internist, appear to have examined Plaintiff in connection with their reports, and their reports reflect this.  On the other hand, two state agency consultants – N. Wade-Hull (whose area of expertise is not stated), and Dr. T. Harding, a psychologist – appear to have provided opinions regarding Plaintiff's ability to work based only on their own reviews of the file.  The reports of these four consultants are described in turn.

a.      **Report of Consulting Psychiatrist (Dr. Meadow)**

On September 30, 2009, Dr. Meadow, a consulting psychiatrist, examined Plaintiff at the request of the SSA.  (*See id.* at 283.)  Dr. Meadow's notes state that, at the time of his examination, Plaintiff had three children, aged 24 to 17, and that she lived at home with the younger two children.  (*Id.*)  Plaintiff told Dr. Meadow that she had been driven to the appointment by a friend and that she avoided public transportation because of panic attacks. (*Id.*)  Plaintiff explained that she had last worked as a housekeeper in 2003, but that she stopped because of asthmatic problems.  (*Id.*)  Plaintiff said that, at home, she took care of her personal hygiene and did all of the household chores, and that she socialized with friends and family and spent her days watching TV and listening to music.  (*Id.* at 285.)

Plaintiff described her current functioning to Dr. Meadow, and told him that she had difficulty falling asleep and had gained 60 pounds in the past year.  (*Id.* at 283.)  She also reported symptoms of depression, including what Dr. Meadow described as "dysphoric moods, crying spells, irritability, low energy, diminished self-esteem[,] and difficulty concentrating." (*Id.*)  She told Dr. Meadow that she had had suicidal thoughts in the past, but had no suicidal

23

intent at that time, and that she had experienced physical and sexual abuse as a child, but she denied symptoms of PTSD.  (*Id.*)  Dr. Meadow indicated that Plaintiff reported heightened levels of anxiety and panic attacks, which she described as "palpitations and difficulty breathing[,] occurring when she is in crowded spaces."  (*Id.* at 283-84.)  Plaintiff said the frequency of such attacks varied.  (*Id.* at 284.)  Dr. Meadow wrote that Plaintiff's manic symptoms were "specific to psychomotor agitation."[24]  (*Id.*)  He noted that Plaintiff had a history of auditory and visual hallucinations, which the medication had stopped, and that Plaintiff denied any cognitive deficits.  (*Id.*)

Dr. Meadow evaluated Plaintiff's mental status and noted that Plaintiff was appropriately dressed, neat and casual, well-groomed, and that Plaintiff made appropriate eye contact.  (*Id.*) Dr. Meadow indicated that Plaintiff's speech was "fluent and clear," her thought processes were "[c]oherent and goal directed," and there was no evidence of hallucinations, delusions, or paranoia.  (*Id.*)  He described Plaintiff's affect as "[a]ppropriate in speech and thought content," her mood as "depressed," and her insight and judgment as "fair."  (*Id.*)  Dr. Meadow found that Plaintiff's memory, attention, and concentration were intact, and that her intellectual functioning was average.  (*Id.* at 284-85.)

On Axis I, Dr. Meadow diagnosed Plaintiff with depressive disorder, not otherwise specified ("NOS"); "rule out bipolar disorder;" "rule out schizoaffective disorder;" generalized anxiety disorder; panic disorder without agoraphobia; and alcohol and cocaine

---

[24] Psychomotor agitation "refers to excessive motor activity associated with a feeling of inner tension.  The activity is usually non-productive, repetitive and consists of behavior such as pacing, fidgeting, wringing hands, pulling of clothes and an inability to sit still.  [It is] [a]lso characterized by restlessness, pacing, rocking, etc., on the part of a distressed individual."  *See* http://www.psychology-lexicon.com/cms/glossary/glossary-p/654-psychomotor-agitation.html (last visited Apr. 3, 2014).

abuse/dependence, in remission.  (*Id.* at 285.)  He deferred diagnosis on Axis II, and, on Axis III, he diagnosed Plaintiff with hypertension, arthritis, and asthma.  (*Id.*)  In his medical source statement, Dr. Meadow opined that Plaintiff would have "some difficulty dealing with stress," but that, "[o]therwise, she would be able to perform all other tasks necessary for vocational functioning."  (*Id.*)  He recommended that Plaintiff continue with psychiatric treatment and opined that Plaintiff's prognosis was "[f]air."  (*Id.* at 286.)

### b.     Report of Consulting Internist (Dr. Akresh)

On September 30, 2009, Dr. Akresh, a consultant in internal medicine, also conducted a consultative examination of Plaintiff at the request of the SSA.  (*Id.* at 287-90.)  Dr. Akresh asked Plaintiff about her activities of daily living and social history.  (*Id.* at 288.)  Plaintiff reported that she did "some cooking, but [that] her daughters did most of it."  (*Id.*)  Plaintiff also said that she cleaned and washed laundry once per week, and that she went shopping once per month.  (*Id.*)  Plaintiff indicated that she cared for her personal needs, watched television, and listened to the radio.  (*Id.*)  Dr. Akresh noted that Plaintiff said she smoked half a pack of cigarettes a day, but that she did not use any street drugs.  (*Id.*)

Plaintiff told Dr. Akresh that she had a history of hypertension, which was controlled with medication; asthma, for which she had visited the emergency room two months prior; anxiety and depression, which were being treated with psychotherapy and medication; arthritis, with pain in her knees and hands; low back pain, for which she occasionally wore a soft brace; and a history of uterine fibroids and anemia that had been ongoing for many years.  (*Id.* at 287.)  Plaintiff said she had been hospitalized for asthma "a few years ago," but that did not remember any more details.  Plaintiff also reported to Dr. Akresh that she had had X-rays and an MRI done several years earlier, and that she was told that she had herniated discs.  (*Id.* at 287.)  Plaintiff

said that she was treated with physical therapy several years earlier and that she would sometimes wear her soft brace when cleaning or bending because of pain in her lower back.  (*Id.*)

Dr. Akresh conducted a physical examination of Plaintiff and observed that Plaintiff did not appear to be in any acute distress.  (*Id.* at 288.)  The doctor noted that Plaintiff had a "normal" gait and stance, could "walk on heels and toes without difficulty," could squat "halfway," and used no assistive devices.  (*Id.*)  Dr. Akresh further observed that Plaintiff did not require "help changing or getting on and off exam table," and that Plaintiff was able to "rise from a chair without difficulty."  (*Id.* at 288-89.)  Among other things, Dr. Akresh examined Plaintiff's chest, lungs, and skin, and found that all were normal.  (*Id.* at 289.)  With respect to Plaintiff's chest and lungs, Dr. Akresh noted that Plaintiff had "normal AP diameter," was "clear to auscultation," had a normal percussion, had "no significant chest wall abnormality," and had "[n]ormal diaphragmatic motion."  (*Id.*)

Dr. Akresh's examination of Plaintiff's cervical and lumbar spine revealed that Plaintiff had full range of motion (flexion, extension, lateral flexion, bilaterally, rotary movement bilaterally), and that there was no scoliosis, kyphosis, or abnormality in Plaintiff's thoracic spine.  (*Id.*)  The doctor noted that Plaintiff had "some tenderness in the midline of the L5 region," but Plaintiff's straight leg raise test was negative on both sides.  (*Id.*)  Plaintiff's upper and lower extremities (shoulders, elbows, forearms, writs, hips, knees, and ankles) had full strength (5 out of 5) and full range of motion, with the exception of Plaintiff's left knee, which showed full extension, but flexion diminished to 140 degrees.  (*Id.*)  Dr. Akresh did not find any abnormalities in Plaintiff's bones, muscles, or joints, except for "some mild osteoarthritic changes in the hands."  (*Id.* at 288-90.)  Dr. Akresh also noted that Plaintiff's joints were stable and there was no redness, heat, swelling, or effusion in the joints.  (*Id.*)  Dr. Akresh tested

26

Plaintiff's fine motor activity and found that Plaintiff's "[h]and and finger dexterity [was] intact" and that Plaintiff had full grip strength bilaterally.  (*Id.*)  Finally, the doctor noted that she had ordered an X-ray of Plaintiff's lumbosacral spine and that the results were "negative."  (*Id.* at 290; *see also id.* at 292.)

Based on all of the foregoing, Dr. Akresh diagnosed Plaintiff with chronic low back pain; a history of herniated lumbar disks; hypertension; asthma; a history of anxiety and depression; osteoarthritis of the knees; a history of anemia and uterine fibroids; and status post bilateral tubal litigation.  (*Id.* at 290.)  In her medical source statement, Dr. Akresh opined that Plaintiff had "mild limitations in her ability to lift and carry heavy objects secondary to a history of herniated lumbar disks."  (*Id.*)  She also indicated that there were "mild limitations" on Plaintiff's ability to walk for "long distances" due to "osteoarthritis of the knees."  (*Id.*)

### c.    <u>Report of Functional Capacity Consultant (Wade-Hull)</u>

On October 13, 2009, state agency consultant N. Wade-Hull, whose title, affiliation, and area of expertise do not appear in the record, completed a Physical Residual Functional Capacity Assessment form.  (*Id.* at 295-300.)  Wade-Hull assessed Plaintiff as being able to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8 hour workday, and sit about 6 hours in an 8 hour work day.  (R. at 296.)  Wade-Hull opined that Plaintiff had an unlimited ability to push and/or pull (*id.*), but that she could only occasionally climb ramps/stairs/ladders/ropes/scaffolds, crouch, and crawl (*id.* at 297).  Finally, Wade-Hull advised that Plaintiff should avoid concentrated exposure of fumes, odors, dusts, gases, and poor ventilation.  (*Id.* at 298.)

### d.      Report of Psychologist (Dr. Harding)

On October 16, 2009, state agency psychological consultant Dr. T. Harding completed a

Psychiatric Review Technique Form ("PRTF")[25] and a Mental Residual Functional Capacity

Assessment ("MRFCA") form in connection with Plaintiff's disability application.  (*Id.* at 301-

15.)  In the former, Dr. Harding opined that Plaintiff suffered from depression, NOS; panic

disorder; and a history of mixed substance abuse.  (*Id.* at 304, 306, 309.)  Dr. Harding assessed

Plaintiff as having mild restrictions of activities of daily living, moderate difficulties in

maintaining social functioning, and moderate difficulties maintaining concentration, persistence,

or pace.  (*Id.* at 311.)

In Section I of the MRFCA form, Dr. Harding expressed certain "summary conclusions"

derived from reviewing the evidence in the file.  The doctor opined that Plaintiff was "[n]ot

[s]ignificantly [l]imited" in the vast majority of work-related skills (*id.* at 315-16), but was

"[m]oderately [l]imited" in the abilities to understand, remember, and carry out detailed

instructions; accept instructions and respond appropriately to criticism from supervisors; and

respond appropriately to changes in work setting (*id.* at 315-16).

In Section III of the form (*id.* at 317), Dr. Harding provided a residual functional capacity

assessment, and explained the documents on which that assessment was based.  According to the

doctor, the reviewed records included Plaintiff's disability application forms and medical records

from North Bronx Hospital, F.E.G.S.,[26] the reports of the consultative examiners, and the

---

[25] The PRTF is the form in which the SSA must document its application of the "special technique" required in mental impairment cases.  *See* 20 C.F.R. § 416.920a(e), as discussed *infra*, at Discussion, Part I(C).

[26] One of the F.E.G.S. reports that Dr. Harding mentions is dated February 13, 2009.  It is in the record at pages 234-47.  As discussed further below (*see infra* at Discussion, Part

May 2009 report of Dr. Bathija.  Dr. Harding noted that Plaintiff's medical records from F.E.G.S. dated September 10, 2008 through July 12, 2009, along with Plaintiff's BPS report dated September 10, 2008, illustrated that Plaintiff had endorsed daily marijuana usage, yet the social worker had reported that Plaintiff denied substance abuse.  (*Id.* at 317.)  Dr. Harding also pointed out that, although Plaintiff had reported in her Disability Form SSA-3368 that she burned herself regularly to get the evil thoughts out of her mind (*id.* at 180), the internist who had conducted Plaintiff's consultative evaluation had reported that Plaintiff's skin exam was normal (*see id.* at 317).  In making his assessment, Dr, Harding also relied on the fact that Plaintiff had a PHQ-9 score of 4, and that she had reported cooking, cleaning, shopping, paying bills, and taking public transportation alone.  (*Id.*)  Dr. Harding referred to the mental status examinations conducted by Dr. Bathija and the consultative examiner and noted the normal results.  (*Id.*)  Finally, Dr. Harding noted that Plaintiff had reported a history of auditory and visual hallucinations, but that no treating sources had diagnosed Plaintiff with psychosis or schizoaffective disorder.  (*Id.* at 317.)

Dr. Harding concluded, from the reviewed documents, that Plaintiff had the residual functional capacity to "understand and follow simple directions, make simple work-related decisions, and respond appropriately to supervisors and co-workers."  (*Id.*)  He also opined that, while Plaintiff suffered from a severe impairment that did not rise to a "Listings level," the

---

III(B)(2)(b)), this record, on its face, does not appear to relate to Plaintiff, but rather to another patient.  Thus, to the extent Dr. Harding has made any statements in direct reliance on this document, the Court will disregard those statements.  Moreover, this Court is directing that the pages of the record in question be placed under seal, so as to protect the confidentiality of the individual who is the subject of the report.

severity of Plaintiff's impairment might pose mild-to-moderate limits "on her ability to adapt to changes in a work setting." (*Id.*)

### C.   <u>Vocational Expert Testimony</u>

Vocational expert Luthar D. Pearsall, Ph.D., testified at the hearing before the ALJ. (*See id.* at 126-32; 38-56.) Dr. Pearsall questioned Plaintiff about her past work experience, and Plaintiff told him about her work as a retail floor clerk and a cashier. (*Id.* at 41-42.) The ALJ then asked Dr. Pearsall to consider a hypothetical individual of the same age, education, and work experience as the Plaintiff, and to consider that:

> This individual would be able to perform light work as defined in our regulations. The hypothetical individual would occasionally be able to climb, frequently stoop, occasionally kneel, frequently, or occasionally crouch and crawl. The hypothetical individual would need to avoid concentrated exposure to environmental irritants such as fumes, dust, and gases. The hypothetical individual would be able to understand, remember, and carry out simple instructions, make judgment on simple work related decisions, interact appropriately with supervisors and co-workers in a routine work setting, and respond to usual work situations and changes in a routine work setting.

(*Id.* at 46.) The ALJ asked Dr. Pearsall whether such a hypothetical individual could perform any work in the national or regional economy. (*Id.* at 47.) Dr. Pearsall testified that the hypothetical person could perform unskilled, light jobs, such as a sorter, an assembler, and a light or night housekeeper.[27] (*Id.* at 48.)

The ALJ then asked the vocational expert to add to the hypothetical that the individual could "tolerate superficial interaction with the public," but could only tolerate "occasional direct

---

[27] For each of the positions the vocational expert identified, he provided the corresponding section numbers from the U.S. Dept. of Labor, *Dictionary of Occupational Titles* ("DOT") (4th ed. 1991). The section numbers were: 729.687-146 for sorter, 706.687-010 for assembler, and 323.687-014 for light or night housekeeper. (R. at 48.)

customer service interaction." (*Id.* at 48.)  The ALJ defined "occasional" as 33 percent of a

workday.  (*Id.*)  The vocational expert testified that the hypothetical person could still perform

the positions of sorter, assembler, and housekeeper.  (*Id.*)  Plaintiff's attorney asked the

vocational expert whether a person who was absent on average three or more days a month

would be able to meet employer competitive standards for the positions discussed, and the expert

replied that such a person would not meet competitive standards.  (*Id.* at 54.)

Dr. Pearsall also testified that, for the position of sorter, there were 4,000 positions in the

New York state economy and 480,000 in the national economy; for the position of assembler,

there were 12,000 positions in the New York state economy and 1,000,000 positions in the

national economy; and, for the position of light or night housekeeper, there were 25,000

positions in the New York state economy and nearly 2,000,000 in the national economy.  (*Id.* at

48.)  He explained that he had obtained the numbers for each position through a professional

service called the Occupational Index Classification, which provided quarterly updates on

positions in the state, regional, and national economies.  (*Id.* at 50.)  He noted, however, that the

numbers were probably about three to four years old because the publication was always running

about three to four years behind.  (*Id.*)

     **D.**     <u>**Procedural History**</u>

          **1.**     <u>**Plaintiff's Application for SSI Benefits**</u>

On July 21, 2009, Plaintiff protectively filed an application for SSI, alleging disability as

of January 1, 2004.  (R. at 59, 168-69, 170-76, 177.)  On October 20, 2009, the SSA denied her

claim.  (*Id.* at 61-64.)  On November 13, 2009, Plaintiff requested a hearing before an ALJ.  (*Id.*

at 69.)

### 2.      The Administrative Hearing and Decision Denying Benefits

On August 19, 2010, Plaintiff appeared, with a non-attorney representative, before ALJ

Pang for an administrative hearing.  (*See id.* at 23, 25-57, 60.)  Plaintiff testified at the hearing, as

discussed above.  (*See supra*, at Background, Part A.)  The vocational expert, Dr. Pearsall, also

appeared and testified at the hearing.  (R. at 13, 38-54.)

On November 18, 2010, the ALJ issued a decision finding that Plaintiff was not disabled

under the Act.  (*Id.* at 13-22.)  The ALJ found that Plaintiff suffered from severe impairments,

but found that these impairments did not meet or medically equal any of the listed impairments

in the Social Security Regulations.  (*Id.* at 15-16.)  Next, the ALJ found that Plaintiff had the

residual functional capacity ("RFC") to perform a range of light work as defined in 20 C.F.R.

§ 416.967(b).[28]  (*Id.* at 16-17.)  Finally, the ALJ concluded that Plaintiff was not "disabled"

within the meaning of the SSA from July 21, 2009 through the date of the decision.  (*Id.* at

13, 22.)  The ALJ's decision became the final decision of the Commissioner on August 24, 2011,

when the Appeals Council denied Plaintiff's request for review.  (*Id.* at 1-3.)  This action

followed.

### 3.      The Motions Before This Court

Currently pending before this Court are Defendant's motion and Plaintiff's cross-motion

for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

Defendant argues that the final decision of the Commissioner must be upheld because the ALJ

---

[28] An RFC assessment determines the extent to which the claimant's impairments and
related symptoms affect his or her ability to work.  *See* 20 C.F.R. §§ 404.1545(a)(1),
416.945(a)(1).  An RFC is intended to represent "the most [the claimant] can still do despite [his
or her] limitations."  *Id*.  An ALJ's assessment of a claimant's RFC should be based on all
relevant medical and non-medical evidence.  *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

applied the correct legal standards and his decision was supported by substantial evidence.  (*See generally* Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, dated Apr. 6, 2012 ("Def. Mem.") (Dkt. 18); Defendant's Reply and Memorandum of Law in Opposition to Plaintiff's Cross Motion for Judgment on the Pleadings, dated Oct. 11, 2012 ("Def. Reply Mem.") (Dkt. 27).)  Plaintiff, for her part, argues that the Commissioner's decision should be reversed or remanded because the ALJ's decision was not supported by substantial evidence and was based on legal error.  (*See generally* Memorandum of Law in Support of Plaintiff's Cross Motion for Judgment on the Pleadings or in the Alternative to Remand Case Back to the Administration, dated Sept. 4, 2012 ("Pl. Mem.") (Dkt. 26); Memorandum of Law in Further Support of Plaintiff's Cross Motion for Judgment on the Pleadings or in the Alternative to Remand Case Back to the Administration, dated Nov. 26, 2012 ("Pl. Reply Mem.") (Dkt. 30).)

Although Defendant filed the first of the parties' motions for judgment on the pleadings, this Court has looked to Plaintiff's cross-motion to understand the nature of Plaintiff's challenges to the ALJ's decision.  Specifically, Plaintiff argues that:  (1) the ALJ failed to develop the administrative record sufficiently, by failing to request additional records from Plaintiff's treating psychiatrist and psychologist, as well as from F.E.G.S. (Pl. Mem., at 2-5); (2) the ALJ erroneously failed to consider Plaintiff's alleged carpal tunnel syndrome as a severe impairment (*id.* at 5); (3) the ALJ erroneously made RFC findings that were inconsistent with his findings at step three of the sequential evaluation, discussed below, and failed to acknowledge relevant evidence in making his RFC assessment (*id.* at 5-12); (4) the ALJ failed to apply the treating physician rule properly (*id.* at 12-18); (5) the ALJ's RFC finding that Plaintiff could perform "light" work was not supported by substantial evidence (*id.* at 19-20); (6) the ALJ provided

inaccurate hypotheticals to the vocational expert; and (7) the vocational expert's testimony regarding the jobs that Plaintiff could perform was unreliable (*id.* at 20-25).

## DISCUSSION

## I.     APPLICABLE LEGAL STANDARDS

### A.     Standard of Review

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g) (2006); *Shaw v. Carter*, 221 F.3d 126, 131 (2d Cir. 2000).  "Where an error of law has been made that might have affected the disposition of the case, this [C]ourt cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citations omitted).  Thus, the Court must first ensure that the ALJ applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.1987).

The Court must then determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  The Court must consider the record as a whole in making this determination, but it is not for this Court to decide *de novo* whether a plaintiff is disabled.  *See Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*,

34

104 F.3d 1432, 1433 (2d Cir. 1997).  The Court will uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming an ALJ decision where substantial evidence supported both sides).

### B.      The Five-Step Sequential Evaluation

To be entitled to benefits under the Social Security Act, a plaintiff must establish his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is considered to be under a disability only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

In evaluating a disability claim, the ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. § 416.920 (2012); *id.* § 404.1520; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  First, the ALJ must determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i).  If not, then the second step requires the ALJ to consider whether the claimant has a "severe" impairment or combination of impairments that significantly limit his or her physical or mental ability to do basic work activities.  20 C.F.R.

35

§ 416.920(a)(4)(ii), (c).  If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals a listed impairment in Appendix 1 of the regulations.  20 C.F.R. § 416.920(a)(4)(iii).  If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience."  20 C.F.R. § 416.920(a)(4)(iii), (d).  If the presumption does not apply, then the fourth step requires the ALJ to determine whether the claimant is functionally able to perform his or her "past relevant work."  20 C.F.R. § 416.920(a)(4)(iv).  Finally, if the claimant is unable to perform his or her past relevant work, then the fifth step requires the ALJ to determine whether, in light the claimant's RFC and vocational factors, the claimant is capable of performing "any other work" that exists in the national economy.  20 C.F.R. § 416.920(a)(4)(v), (g).

    In making a determination pursuant to the process discussed above, the ALJ must consider four sources of evidence:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citations omitted).

    When a claimant complains of a mental impairment, the ALJ must apply a "special technique," outlined in 20 C.F.R. § 416.920a, for determining the severity of the claimant's impairment at step two and whether the impairment meets or equals a listed impairment at step three.  *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  If the claimant is found to have a "medically determinable mental impairment," the ALJ must then "'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph [404.1520a(c), 416.920a(c)],' which specifies four broad functional areas:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of

decompensation." *Id.* at 266 (quoting 20 C.F.R. §§ 404.1520a(b)(2) and (c)(3)).  The functional

limitations for the first three of these areas are rated on a five-point scale of "[n]one, mild,

moderate, marked, and extreme," and the limitation in the fourth functional area (episodes of

decompensation) is rated on a four-point scale of "[n]one," "one or two," "three," and "four or

more."  20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4).

On the first four steps of the five-step evaluation, the claimant generally bears the burden

of establishing facts to support his claim.  *See Berry*, 675 F.2d at 467 (internal citation omitted).

At the fifth step, the burden shifts to the Commissioner to "show that there is work in the

national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir.

2009); *see also Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).  The Commissioner must

prove that the alternative work "exists in significant numbers" in the national economy and that

the claimant can perform this work, given his RFC and vocational factors.  20 C.F.R.

§ 416.960(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can

satisfy his burden at the fifth step of the analysis by referring to the Medical-Vocational

Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008).  Where, however, the claimant

suffers non-exertional impairments (such as psychiatric impairments) that "'significantly limit

the range of work permitted by his exertional limitations,' the ALJ is required to consult with a

vocational expert," rather than rely on these published guidelines.  *Zabala v. Astrue*, 595 F.3d

402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (internal

citations omitted)).  To be useful, the testimony of a vocational expert regarding the claimant's

ability to work must incorporate the full extent of the claimant's limitations and capabilities.  *See*

*Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981); *see also Lugo v. Chater*, 932 F. Supp.

497, 504 (S.D.N.Y. 1996).  Assuming the claimant's limitations are fully incorporated into the

vocational expert's analysis regarding the type of jobs that the claimant can perform, then, to

satisfy his burden at step five, the Commissioner may rely on the vocational expert's testimony

to demonstrate that a sufficient number of such jobs exist in the national economy.  *See* 20

C.F.R. § 404.1594(f)(8); *Bapp*, 802 F.2d at 604-05.

> ### C.      <u>Duty to Develop Record</u>

Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ

generally has an affirmative duty to develop the administrative record, *Perez v. Chater*, 77 F.3d

41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755

(2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Snell*, 177 F.3d at

133 (2d Cir. 1999).  The SSA regulations describe this duty as:  "[b]efore we make a

determination that you are not disabled, we will develop your complete medical history . . . [and]

will make every reasonable effort to help you get medical reports from your own medical

sources when you give us permission to request the reports."  20 C.F.R. § 416.912(d).  "Every

reasonable effort" is, in turn, defined to mean that the SSA "will make an initial request for

evidence from your medical source and, at any time between 10 and 20 calendar days after the

initial request, if the evidence has not been received, we will make one follow up request to

obtain the medical evidence necessary to make a determination."  20 C.F.R. § 416.912(d).  The

regulations further explain that "[b]y 'complete medical history,' we [the SSA] mean the records

of your medical source(s)."  20 C.F.R. § 416.912(d)(2).

Additionally, if the information obtained from the medical sources is insufficient to make

a disability determination or the Commissioner is unable to seek clarification from treating

sources, the regulations provide that the Commissioner should ask the claimant to attend one or

more consultative evaluations.  20 C.F.R. § 416.912(e).  Finally, "[i]f an ALJ perceives

inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out

more information from the treating physician and to develop the administrative record

accordingly."  *Hartnett v. Apfel*, 21 F. Supp. 2d 217, 221 (E.D.N.Y. 1998).

### D.     Weight To Be Accorded to the Opinions of Treating Physicians

The ALJ must give "controlling weight" to a treating physician's opinion, as long as the

treating physician's "opinion on the issue(s) of the nature and severity of [the] impairment(s) is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2).  Where the ALJ decides to give less than controlling weight to a treating

physician's opinion, "the ALJ must apply a series of factors in determining the weight to give

such an opinion."  *Aronis v. Barnhart*, No. 02 Civ. 7660 (SAS), 2003 WL 22953167, at *5

(S.D.N.Y. Dec. 15, 2003) (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)[29]).  These factors

include:  (1) the length of the treatment relationship and the frequency of examination; (2) the

nature and extent of the treatment relationship, including whether the treatment received was

particular to the claimant's impairment; (3) the supportability of the opinion; (4) the consistency

of the opinion with the record as a whole; and (5) the specialization of the physician providing

the opinion.  20. C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5); *see also Shaw v. Chater*, 221

F.3d 126, 134 (2d Cir. 2000) (noting that these factors "must be considered when the treating

physician's opinion is not given controlling weight").  Where the ALJ determines that a treating

---

[29] On February 23, 2012, the Commissioner amended 20 C.F.R. §§ 404.1527, 416.927,
by, among other things, removing paragraph (c), and redesignating paragraphs (d) through (f) as
(c) through (e).

physician's opinion is not entitled to controlling weight, the ALJ must give "good reasons" for

not granting it such weight.  *Id.*

## II.      <u>THE ALJ'S DECISION</u>

In this case, after reviewing the evidence under the five-step procedure, the ALJ

concluded that Plaintiff was not disabled.  At step one of the sequential analysis, the ALJ found

that Plaintiff had not engaged in substantial gainful activity since July 21, 2009, the date of

Plaintiff's application for DIB.  (R. at 15.)

At step two of the analysis, the ALJ found that Plaintiff had six severe impairments:

(1) degenerative joint disease; (2) arthritis; (3) hypertension; (4) asthma; (5) anxiety; and (6) a

mood disorder.  (*Id.*)  The ALJ addressed Plaintiff's claim that she was disabled because of

herniated discs in her back and concluded that there was not sufficient evidence for him to

conclude that Plaintiff had a medically determinable back impairment, as required by the SSA

regulations.  (*Id.* (citing 20 C.F.R. § 416.920(c)).)  The ALJ explained that Plaintiff's allegations

of back pain alone could not establish a medically determinable impairment and that there was

no medical or clinical evidence to establish the existence of such an impairment.  (*Id.*)

Next, at step three, the ALJ concluded that none of Plaintiff's conditions met or

medically equaled an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (*id.* at 15-16),

specifically explaining his reasoning with respect to Plaintiff's mental conditions (*id*. at 16).  He

concluded that Plaintiff only had "mild" restrictions on her activities of daily living.  (*Id.*)  He

found that Plaintiff had "moderate difficulties" with "social functioning," noting that Plaintiff did

"not enjoy being around others," would "grocery shop early in the morning to avoid others,"

would not use "public transportation on her own or in rush hour," and was "angered easily."

(*Id.*)  He also found that Plaintiff had "moderate difficulties" with "concentration, persistence or

pace," noting Plaintiff's allegations that she had difficulty with her memory and concentration, that her medications made her drowsy, and that she had trouble sleeping. (*Id.*)  Finally, the ALJ noted that Plaintiff had never experienced any episodes of decompensation. (*Id.*)  Based on his findings, the ALJ concluded that Plaintiff's mental impairments neither satisfied the paragraph B nor the paragraph C criteria in the regulations. (*Id.*)  The ALJ also noted that his descriptions of Plaintiff's limitations, at this juncture, were not an RFC assessment, but rather were used to rate the severity of Plaintiff's mental impairments at step two and three of the sequential evaluation.

In connection with proceeding to the fourth step of the sequential analysis, the ALJ found that Plaintiff had the RFC to perform "light work," as long as it did not entail "concentrated exposure to environmental irritants," and as long as it did not require more than occasional climbing, kneeling, crouching, and crawling. (*Id.* at 17.)  In addition, the ALJ found that Plaintiff had the ability "to understand, remember, and carry out simple instructions; make judgments on simple work related decisions; interact appropriately with supervisors and co-workers in routine work settings; and respond to usual work situations and changes in a routine work setting," but that Plaintiff could "tolerate only superficial interaction with the public, and only occasional direct customer service interaction." (*Id.*)

As support for his RFC assessment, the ALJ first evaluated Plaintiff's testimony against the evidence in the record.  The ALJ concluded that, while Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, Plaintiff's statements regarding the intensity, persistence and limiting effects of those symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (*Id.* at 18.)  The ALJ said that, in this regard, he took into account several inconsistencies in the record, Plaintiff's poor work

41

history, and the fact that the F.E.G.S. examiners found Plaintiff to be an unreliable historian when explaining her own medical history.  (*Id.* at 18-19.)

The ALJ also evaluated the opinion evidence.  In terms of Plaintiff's mental impairments, the ALJ reviewed the medical evidence provided by F.E.G.S., Dr. Meadow, and Plaintiff's treating doctors and reasoned that the evidence showed that, once Plaintiff began taking psychopharmaceutical medication in 2008, her mood greatly improved, although she continued to be symptomatic.  (*Id.*)  He noted that, when Plaintiff first sought treatment at F.E.G.S., she scored a four on the PHQ-9 scale, which indicated no depressive symptoms, and that she had since been receiving weekly psychotherapy and monthly medication management with a psychiatrist.  (*Id.* at 19.)  He also pointed to Dr. Bathija's assessment in his May 2009 report that all of Plaintiff's symptoms were negative or mild, and the fact that Dr. Bathija gave her a GAF score of 71 at that time.  (*Id.*)  He reasoned that her treating doctors "reiterated this in November 2009, stating that she is better with her medication although not stable."  (*Id.*)  He also acknowledged that the doctors said that, since 2008, Plaintiff had demonstrated "symptoms such as pressured speech, flight of ideas, poor anger management, and irritability."  (*Id.*)  The ALJ noted, however, that, as of November 2009, Plaintiff's mental status exam results showed that she had intact memory, attention, and concentration.  (*Id.*)  The ALJ further pointed out that, as of September 2009, at the consultative examination, Plaintiff's mental status exam was found to be "entirely normal except for a depressed mood" and she complained of being unable to use public transportation.  (*Id.*)  Overall, the ALJ concluded that Plaintiff's symptoms were generally improved on medication, but that they resulted in the limitations described in his RFC assessment.  (*Id.*)

The ALJ gave "great weight" to the psychiatric consulting examiner's opinion (Dr. Meadow) because it was "from an examining medical source, consistent with the grossly normal results of the psychiatric evaluation, and generally supported the other relevant evidence of record showing that, while symptomatic, [Plaintiff's] symptoms [were] better with medication." (*Id.* at 20.)  The ALJ gave only "some weight" to the opinion of the State agency medical consultant (Dr. Harding), because, while the ALJ found that this opinion was based on the documentary evidence and Dr. Harding was an "expert in the evaluation of disability claims" under the SSA (*id.* at 19), Dr. Harding did not examine Plaintiff in person and did not consider Plaintiff's testimony at the administrative hearing (*id.*).

The ALJ also considered the opinions of Plaintiff's treating psychiatrist (Dr. Bathija) and psychologist (Dr. Breslau).  The ALJ acknowledged that these doctors had opined, in July 2010, that Plaintiff would be unable to meet competitive standards in several categories of mental functioning[30] and that Plaintiff would likely be absent from any job four days a month.  (*Id.* at 20.)  The ALJ also acknowledged their November 2009 opinion that Plaintiff was not stable enough to work, would have difficulty following directions, and could have difficulty following supervisory instruction.  (*Id.*)  Although both Drs. Bathija and Breslau were "treating medical sources with a longitudinal history with the claimant," the ALJ noted that he could not evaluate their conclusions against their treatment notes because the notes were not in the record.  The ALJ concluded that the opinions were not consistent with the relevant evidence, overstated Plaintiff's limitations, and were not supported by substantial evidence.  (*Id.*)

---

[30] The categories that the ALJ noted were "responding appropriately to supervisors," "getting along with coworkers and peers," and "completing a normal workday and workweek without psychological interruptions."  (R. at 20.)

As for Plaintiff's physical limitations, the ALJ stated that he was giving "great" weight to the opinion of the consulting examiner, Dr. Akresh, who had opined that Plaintiff had "mild" limitations in her ability to walk long distances.  (*Id.*)[31]  The ALJ reasoned that this report was entitled to such weight "because it [wa]s from an examining medical source, [was] consistent with the grossly normal results of the physical evaluation, and generally supported the other relevant evidence of record showing that [Plaintiff] ha[d] mild to moderate limitations with standing and lifting, most reasonably limiting her to light work."  (*Id.*)

The ALJ then found, at step four, that Plaintiff had no past relevant work experience, so he proceeded to the fifth step of the sequential analysis.  At this final step, the ALJ relied on the testimony of the vocational expert that someone with Plaintiff's RFC could perform the jobs of sorter, assembler, and housekeeper.  (*Id.* at 21.)  He also found that the vocational expert's testimony was consistent with the information in the DOT.  (*Id.*)  Finally, based on the vocational expert's testimony as to the numbers of jobs of sorter, assembler, and housekeeper in the regional and national economies, the ALJ concluded that Plaintiff retained the residual functional capacity to perform jobs that existed in significant numbers in the national economy.  (*Id.*)  Accordingly, he concluded that Plaintiff was not disabled within the meaning of the SSA.  (*Id.*)

Given that the ALJ followed the five-step procedure set forth in the Social Security regulations, this Court's review is limited to determining whether, in the course of following that procedure, the ALJ correctly applied the relevant legal principles, and whether his decision was supported by substantial evidence.  As mentioned above, Plaintiff argues that the ALJ erred at

---

[31] In his decision, the ALJ apparently mis-cited Dr. Akresh's report as "Ex. 9F" (R. at 20); that report appears in the administrative record as Exhibit 4F.

several points in the sequential evaluation.  Given the related nature of some of Plaintiff's arguments, the Court will address Plaintiff's arguments in the following order:  First, whether the ALJ erred at step two of the analysis by failing to take further steps to develop the record with respect to Plaintiff's allegations of a herniated disc, and by failing to find that Plaintiff's carpal tunnel syndrome constitute a "severe" impairment; second, whether the ALJ's failure to issue a second request to Plaintiff's treating psychiatrist and psychologist for their treatment records violated the ALJ's duty to develop the record, and whether the ALJ did not properly apply the treating physician rule; third, whether the ALJ's RFC analysis was legally flawed or not supported by substantial evidence; and, fourth, whether the Commissioner failed to satisfy his burden at step five because the ALJ provided a flawed hypothetical to the vocational expert or because the vocational expert's testimony was unreliable.

## III.    **REVIEW OF THE ALJ'S DECISION**

### A.    **The ALJ's Findings at Step Two**

At step two of the sequential evaluation process, the ALJ found that Plaintiff had severe impairments related to her degenerative joint disease, arthritis, hypertension, asthma, anxiety, and mood disorder.  (*Id.* at 15.)  Plaintiff argues that the ALJ erred by finding that Plaintiff's alleged herniated disc was not a severe impairment, without first re-contacting Dr. Kompella to clarify the basis of his diagnosis.  Plaintiff also argues, without explanation, that the ALJ erred by not finding that Plaintiff had a severe impairment as a result of carpal tunnel syndrome.  Neither of these arguments are persuasive.

### 1.    Whether the ALJ Should have Further Developed
<u>the Record Regarding Plaintiff's Alleged Herniated Disc</u>

The ALJ rejected Plaintiff's allegation that she suffered from a herniated disc in her back on the ground that there was "no medical or clinical evidence to establish the existence of a medically determinable back impairment" under the governing regulations.  (*Id.* at 15; *see also* 20 C.F.R. § 416.913.)  The ALJ's conclusion was both supported by substantial evidence and legally correct.

With respect to objective medical records, there were no magnetic resonance imaging scans or other diagnostic reports in the record establishing the presence of herniated discs. Indeed, the spine X-rays taken at Plaintiff's consultative examination with Dr. Akresh showed no abnormalities.  (*Id.* at 290-92.)  In addition, there were no clinical findings indicating that Plaintiff had a herniated disc.  According to the examination reports of both Drs. Akresh and Kompella, Plaintiff's straight leg test was negative and Plaintiff had full range of motion in her lumbar spine.  (*Id.* at 227, 289.)  Dr. Akresh specifically did *not* diagnosis Plaintiff with a herniated disc, but instead noted only that Plaintiff had a "history of herniated lumbar disks," apparently based on Plaintiff's self-report that she had previously been diagnosed with a herniated disc a few years earlier.  (*Id.* at 290.)  Further, while Dr. Kompella did diagnose Plaintiff with a herniated disc (*id.* at 229), that diagnosis appears to have been based solely on Plaintiff's complaints of pain (*id.* at 227-29).  The only evidence from Dr. Kompella's treatment notes that would support his diagnosis was that Plaintiff complained of tenderness when he touched her lower back.  (*Id.* at 227.)  Plaintiff's complaints alone, however, cannot support a finding of a medically determinable impairment under the regulations, *see* 20 C.F.R. §§ 416.908, 416.927, 416.928, and it is Plaintiff's burden to come forward with evidence to support her

disability claim, *see* 20 C.F.R. § 416.912(c).  Accordingly, substantial evidence supports the

ALJ's determination that Plaintiff had no medically determinable back impairment.

Plaintiff argues that the ALJ should have re-contacted "the treating physician

[Dr. Kompella]" to clarify the basis of his diagnosis.  (Pl. Mem., at 4.)  As an initial matter, the

Court notes that, contrary to Plaintiff's contention, Dr. Kompella would not have constituted a

"treating physician," such that the ALJ was under an obligation to re-contact him under the

regulation in place at the time of the ALJ's decision.  (*See id.* (citing 20 C.F.R. § 404.1512(e)

(2010)).)  Dr. Kompella only saw Plaintiff once and therefore did not have the "ongoing

treatment relationship" necessary to be a treating source.  20 C.F.R. §§ 404.1502, 416.902.

Moreover, there is no indication that F.E.G.S. withheld any reports or medical records from the

SSA, or that the record was in any way incomplete in this respect, and Plaintiff does not argue as

much.  Indeed, the F.E.G.S. records associated with Dr. Kompella's report indicated that an

orthopaedic "phase two" examination was deemed unnecessary.  (*Id.* at 229.)

In this type of circumstance, where the claimant's complete medical history on the

claimed impairment was already before the ALJ, numerous courts have held that the ALJ would

have had no duty to seek additional information from the source in question.  *See Rosa*, 168 F.3d

at 79 n.5 ("[W]here there are no obvious gaps in the administrative record and where the ALJ

already possesses a 'completed medical history,' the ALJ is under no obligation to seek

additional information in advance of rejecting a benefits claim." (citing *Perez*, 77 F.3d at 48));

*Hogue v. Barnhart*, No. 03 Civ. 4963 (SHS), 2005 WL 1036336, at *14 (S.D.N.Y. May 3, 2005)

(declining to remand where there is no indication of gaps in the record); *Rebull v. Massanari*,

240 F. Supp. 2d 265, 273 (S.D.N.Y. 2002) (noting that the ALJ's fact-finding function "would be

rendered nugatory if, whenever a treating physician's stated opinion is found to be unsupported

by the record, the ALJ were required to summon that physician to conform his opinion to the evidence").  Thus, the ALJ, in this case, did not commit legal error by failing to request additional information on the issue of Plaintiff's alleged herniated disc.

> **2.    Whether Plaintiff's Alleged Carpal Tunnel
> Syndrome Constituted a Severe Impairment**

The ALJ also did not err by failing to consider Plaintiff's alleged carpal tunnel syndrome at step two of the sequential evaluation.

First of all, the Court notes that, while Plaintiff's moving brief included a point heading stating that the ALJ erred by failing to consider her alleged carpal tunnel syndrome, the brief included no argument on this issue.  (*See* Pl. Mem., at 5.)

Moreover, from a review of the record, this Court cannot agree that the ALJ erred by failing to consider carpal tunnel syndrome explicitly, at step two.  Plaintiff did not even allege a disability related to carpal tunnel syndrome in her application forms or at the administrative hearing (*see* R. at 30, 33, 181), and the only evidence that Plaintiff suffered from carpal tunnel syndrome was NP Back's diagnosis (*see id*. at 336).  As the ALJ explained in his opinion at step three, NP Back was not an acceptable medical source who could provide evidence sufficient to establish the existence of a medically determinable impairment.  (*See* R. at 20; 20 C.F.R. §§ 416.908, 416.913.)  NP Back also did not have a longitudinal, treating history with Plaintiff, but rather had only seen Plaintiff twice before completing Plaintiff's report.  (*Id.* at 20; 334, 336, 339.)  NP Back indicated that she had based her report on "limited knowledge" of Plaintiff and a review of Plaintiff's chart.  (*Id.*)  In addition, the ALJ discredited NP Back's report on the ground that her assessment "grossly overstate[d]" Plaintiff's limitations in light of all of the relevant evidence (*id.*), and, notably, Plaintiff does not challenge that finding.  Accordingly, even if the

ALJ erred by failing explicitly to acknowledge NP Back's diagnosis of carpal tunnel syndrome, the error would be harmless because it did not prejudice Plaintiff.  *See Zabala v. Astrue*, 595 F.3d at 410 (finding that harmless error existed where there was "no reasonable likelihood that [the ALJ's] consideration" of a doctor's report would have changed the ALJ's determination that Plaintiff was not disabled).

### B.      The ALJ's Duty To Re-Contact Plaintiff's Treating Psychiatric Doctors and the ALJ's Application of the Treating Physician Rule

Plaintiff argues that the ALJ erred by rejecting the opinions of her treating psychiatrist and psychologist, Drs. Bathija and Breslau, without first making the legally required efforts to obtain their medical records.  (Pl. Mem., at 3.)  In any event, Plaintiff contends that, even if the Court were to consider the record as having been sufficiently developed, the ALJ failed to apply the treating physician rule properly when evaluating the weight that should have been afforded to Drs. Bathija's and Breslau's opinions.  (Pl. Mem., at 9-10, 12-18.)  Defendant argues that the ALJ was not required to develop the medical record further and contends that the ALJ properly applied the treating physician rule.  (Def. Mem., at 21-22; Def. Reply Mem., at 4-5.)  On these points, and given the current state of the record, Plaintiff's arguments are sufficient to warrant remand.

Dr. Bathija, a psychiatrist at NCB Hospital, examined Plaintiff approximately once a month over a period of almost two years for the purpose of medication management.  (*See* R. at 17, 231, 232.)  Dr. Breslau, a psychologist at NCB Hospital, provided Plaintiff with psychotherapy services on a weekly basis for the same time period.  (*Id.* at 232.)  In his decision denying Plaintiff SSI, the ALJ rejected the July 2010 joint opinion of Drs. Bathija and Breslau, that Plaintiff would "be unable to meet competitive standards in the areas of [1] responding

appropriately to supervisors, [2] getting along with coworkers and peers, and [3] completing a normal workday and workweek without psychological interruptions, and that the claimant would be absent from work [an] average [of] four days a week." (*Id.* at 20.)  The ALJ also rejected these doctors' joint opinion from November 2009 that Plaintiff was not stable enough to work, that Plaintiff would have difficulty following directions, and that Plaintiff could also have difficulty following supervisory instruction.  (*Id.* at 20.)

The ALJ did not assign controlling weight to either the November 2009 or the July 2010 opinions of Drs. Bathija and Breslau, and offered the following reasons for declining to do so: First, the ALJ explained that he was unable to evaluate these treaters' reports against "their own examinations and opinions," because their treatment notes were not in the record.  (*Id.*)  Second, the ALJ found that, based on all the evidence that was in the record, "including Plaintiff's credibility," the treaters' opinions "grossly overstate[d] Plaintiff's limitations" and were "not supported by substantial evidence."  (*Id.* at 20.)  The ALJ reasoned that, while some mental limitations were credible, there "was no indication that [Plaintiff] would be absent so often or would be unable to work even with limited interactions with supervisors and peers."  (*Id.*)

As discussed below, in declining to give controlling weight to the November 2009 and July 2010 opinions of Drs. Bathija and Breslau, the ALJ did not comply with his obligation to develop the record adequately, and I recommend that the case be remanded for this reason.  *See Aronis*, 2003 WL 22953167, at *6 (citing *Schaal*, 134 F.3d at 505).  I further recommend that, on remand, the ALJ be directed to address several ambiguities in the medical opinion evidence and to perform a more rigorous analysis of that evidence and the underlying medical record.

### 1.    The ALJ's Obligation To Develop the Record

The parties dispute whether, under the circumstances, the ALJ satisfied his duty to make "every reasonable effort" to obtain medical records from Plaintiff's treaters.  20 C.F.R. § 416.912(d)(1).  On this point, Defendant argues that the ALJ made an appropriate determination that further records of Drs. Bathija and Breslau were unnecessary, while Plaintiff asserts that the ALJ was legally required to issue a follow-up request for these doctors' treatment records.  (Pl. Mem., at 2-3; Pl. Reply Mem., at 5-9, Def. Reply Mem., at 1-3.)[32]

The record contains one HRA report completed by Dr. Bathija, dated May 14, 2009 (R. at 264-65), which apparently attached one "Psychiatrist Examination and Progress Note," of the same date (*id*. at 230-31).  The record also contains two disability questionnaire forms, completed jointly by Drs. Bathija and Breslau, dated November 2009 and July 2010.  (*Id*. at 319-25, 342-46.)  The record does not, however, contain these doctors' treatment notes or other records from Plaintiff's visits over the nearly two-year period in question.

Moreover, the record does not reflect that the ALJ ever asked these doctors for their treatment notes until August 20, 2010, when, after Plaintiff's administrative hearing, the ALJ appears to have sent a single letter – directed generally to NCB Hospital – requesting all of the hospital's treatment records for Plaintiff from August 2008 through the date of the request.  (R.

---

[32] Defendant also argues that the ALJ has discretion not to seek "additional evidence from a medical source if [the ALJ] know[s] from experience that the source either cannot or will not provide the necessary evidence."  (Def. Reply Mem., at 2 (quoting 20 C.F.R. § 404.1520b(c)(1)).  The regulation that Defendant invokes, however, took effect on March 26, 2012, and thus does not apply to this Court's review.  *See Long v. Colvin*, No. 120-CV-610 (FB), 2013 WL 3013667, at *4 n.8 (E.D.N.Y. June 18, 2013) (noting that the version of a regulation "'in effect when the ALJ adjudicated the claim'" is the version applicable on judicial review (quoting *Lowry v. Astrue*, 474 F. App'x 801, 805 n.2 (2d Cir. 2012))).

at 347.)  At the outset of his November 18, 2010 opinion, the ALJ indicated that he had received

no response to his August 20 request and no further medical records from Plaintiff.  (*Id.* at 13.)

As discussed *supra*, the ALJ then proceeded to reject several of the opinions contained in the

November 2009 and July 2010 questionnaires provided by Drs. Bathija and Breslau, stating that

he was "unable to assess the extent to which [these treaters'] own examinations and observations

supported their conclusions" because the doctors' treatment notes were not in the record.

(R. at 20.)

      Contrary to Defendant's argument, it is far from clear that the ALJ made a determination

that the treating source evidence was "unnecessary" (*see* Def. Reply Mem., at 2 (citing 20 C.F.R.

§§ 404.1512(d), 404.1520b(a))), as, nowhere in his opinion, did the ALJ explicitly state that he

had made such a determination.  Further, given that the ALJ expressly relied on the lack of the

treatment records as a reason for rejecting Drs. Bathija's and Breslau's November 2009 and July

2010 opinions (R. at 20), it would be difficult for this Court to conclude that any implicit finding

that the records were not needed was in accord with appropriate legal standards.  *See Johnson v.

Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (ordering remand where it was not clear whether the

ALJ applied the proper legal standards to determine the claimant's legal claim).

      As the missing medical records were from treating sources, and as the ALJ indicated that

the absence of those records directly affected his ability to evaluate the treaters' opinions, the

ALJ was required to make sure that he took adequate steps to try to obtain the missing records

before simply assigning the treaters' opinions no weight.  *See Khan v. Astrue*, No. 11-CV-5118

(MKB), 2013 WL 3938242, at *16 (E.D.N.Y. July 30, 2013) ("The ALJ has a threshold duty to

adequately develop the record before deciding the appropriate weight to give the treating

physician's opinion" (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008))).  Plaintiff is

correct that, in order to fulfill his obligations to undertake "every reasonable effort" to develop the record, the ALJ should have issued at least one follow-up request to the hospital, after the ALJ received nothing in response to his August 2010 request. *See* 20 C.F.R. § 416.912(d)(1) (defining "every reasonable effort" to mean that the SSA will make one initial request for evidence from a claimant's medical source and one follow-up request). Additionally, in the circumstances presented, "every reasonable effort" to secure the records in question should have involved at least one follow-up inquiry directed to the attention of the particular treaters whose records were being sought.

Accordingly, I recommend that the case be remanded so that the ALJ can make the requisite follow-up request for Drs. Bathija's and Breslau's treatment records.

## 2.     **The Treating Physician Rule**

Plaintiff also argues that the ALJ erred by failing to follow the treating physician rule. In evaluating the medical opinion evidence, the ALJ stated that he was giving "great weight" to the opinion of Dr. Meadow, the consultative psychiatrist (R. at 20), "some" weight to the opinion of the non-examining state agency medical consultant, Dr. Harding (*id.* at 19), and no weight to the opinions of Drs. Bathija and Breslau (*id.* at 19), even though the ALJ did cite these two treaters' reports for certain, limited purposes (*see id.* at 20). As discussed above, it was error for the ALJ to have declined to give any weight to the opinions of Drs. Bathija and Breslau without first making the requisite efforts to develop the record. Yet even apart from this, Plaintiff raises a number of arguments relating to the extent of the ALJ's reliance (or to his refusal to accord weight) to aspects of the reports of Drs. Meadow, Harding, Bathija and Breslau. Certain of these arguments have merit, and should also be addressed on remand.

> **a.** **The ALJ's According of Greater Weight to the Opinion of Dr. Meadow Than to That of the Treaters, on the <u>Issue of Plaintiff's Ability To Deal with Workplace "Stress"</u>**

Plaintiff argues that, in at least one respect, the opinion of consultative examiner Dr. Meadow should have been read as consistent with the opinions of treating doctors Bathija and Breslau, and that, in finding the consulting and treating opinions to be inconsistent, and then discounting the opinions of Plaintiff's treaters in favor of the opinion of Dr. Meadow, the ALJ erred in weighing the opinion evidence.  In particular, Plaintiff argues that Dr. Meadow's stated opinion that Plaintiff might have "some difficulty dealing with stress" (a conclusion that, as Plaintiff points out, was vague and did not attempt to assess which, or how many, situations would cause Plaintiff stress) should have been read in light of the treaters' identification of the specific stressors of the workplace environment that would negatively impact Plaintiff's performance.  (Pl. Mem., at 14-15.)  Plaintiff notes that the stressors identified by Drs. Bathija and Breslau included the need to accept instructions and criticism from supervisors, get along with peers or co-workers, and perform at a consistent pace.  (*See id.*)  Thus, Plaintiff argues that, to the extent the ALJ chose to give great weight to Dr. Meadow's report, the ALJ at least should have read that report in light of the treaters' more detailed findings in these areas, and thus concluded that Plaintiff would have difficulty with the specified tasks.  (*See id.*)

To the extent Plaintiff is trying to argue that, to any significant degree, the opinion of Dr. Meadow should be viewed as "consistent" with the opinions of Drs. Bathija and Breslau, Plaintiff's argument is misplaced.  Drs. Bathija and Breslau opined that Plaintiff would have, at a minimum, serious limitations with the majority of the tasks necessary for mental vocational functioning, including "dealing with normal work stress."  (R. at 344.)  Dr. Meadow, on the other hand, specifically opined that Plaintiff could "perform *all* tasks necessary for vocational

54

functioning," *except* that Plaintiff might have "some difficulty dealing with stress." (*Id.* at 285 (emphasis added).)  These two sets of opinions are thus materially inconsistent.

Nevertheless, the Court agrees with one of the points raised by Plaintiff, *i.e.*, that Dr. Meadow's opinion regarding Plaintiff's ability to deal with stress was overly vague. Certainly, Dr. Meadow's use of the word "some" to explain Plaintiff's difficulty dealing with "stress" was insufficient, as it is unclear if "some" was intended to convey a "mild" or "moderate" limitation.  Dr. Meadow also provided no information as to the type of stress that he had in mind – whether it was normal work stress, stress at home, or a specific type of stressful situation. The Court notes that, while it may be permissible, in certain circumstances, for an ALJ to give greater weight to the opinion of a consultative examiner than to that of a treating source, such  circumstances typically include a detailed report or multiple examinations by the consultative examiner. *See, e.g.*, *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (noting that where consultative physician conducted two examinations, including a history of the patient and a sufficiently detailed report, and the ALJ also gave weight to the opinion of the treating physicians, it was not error to accord "substantial weight" to the consultant's opinions).

In the circumstances presented here, this Court recommends that, if, on remand, the ALJ remains inclined to accord great weight to the opinion of Dr. Meadow, the ALJ first be directed to elicit additional detail from Dr. Meadow regarding the degree of Plaintiff's limitation in dealing with stress and the type of stress in question.

### b.  <u>The ALJ's Reliance on the Opinion of Dr. Harding</u>

Plaintiff also argues that, as a general matter, the ALJ erred by giving more weight to the opinion of Dr. Harding, a non-examining, state-agency medical consultant, than to the opinions

of Plaintiff's treating psychiatric practitioners.  Under the regulations, consultants like

Dr. Harding are considered experts in the evaluation of disability claims under the Act, *see*

20 C.F.R. § 404.927(e)(2)(i); SSR 96-6p, and the ALJ was entitled to rely on Dr. Harding's

opinion "provided [it is] supported by evidence of record."  *See Diaz v. Shalala*, 59 F.3d 307,

313 n.5 (2d Cir. 1995).  Here, though, Dr. Harding apparently did not review all of the relevant

information in the record and, in fact, it appears that this consultant's opinion rested, at least in

part, on information relating *not* to Plaintiff, but rather to another individual.  For these reasons,

the opinion is suspect, as is the ALJ's reliance on it.

First, while it appears that Dr. Harding's opinion was based on all of the relevant medical

evidence available as of the date of the assessment (October 16, 2009), including Dr. Bathija's

May 2009 report, Dr. Harding did not have access to the two questionnaires subsequently

provided by Drs. Bathija and Breslau.  This, alone, would justify remand.  *See, e.g.*, *Tarsia v.

Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) (remanding where non-examining medical consultant

did not have access to all of the plaintiff's relevant medical information).

Second, although neither party has raised this issue with the Court, it appears that a

F.E.G.S. report from February 2009 – *relating to a patient other than Plaintiff* – was included in

the record by error (*see* n.26, *supra*), and, thus, to the extent Dr. Harding's opinion was based on

a review of this report, his opinion would have been unreliable.  The patient's name on the

February 2009 F.E.G.S. case file is a name other than Plaintiff's, and the address, HRA case

number, and "CIN" number are all different from those found on the F.E.G.S. reports bearing

Plaintiff's name.  (*See generally id.* at 234-47.)  The report also contains details regarding the

patient's life that are inconsistent with the rest of the record regarding Plaintiff, including the fact

that the patient had a four-month-old child and a history of schizophrenia.  (*Id.* at 243.)  In

addition, the patient's PHQ-9 score was a 10 (*id.* at 242), whereas Plaintiff's score was a 4 (*id.* at 222). On remand, the ALJ should be directed to disregard any aspect of Dr. Harding's report that cites this particular record.

Finally, Plaintiff argues, parenthetically, that Dr. Harding's opinion is internally inconsistent because, in Section I of the MRFCA form, Dr. Harding opined that Plaintiff was "moderately limited" in "[t]he ability to accept instructions and respond appropriately to criticism from supervisors," but, in Section III of the form (which asks for the "Functional Capacity Assessment"), Dr. Harding opined that Plaintiff could "respond appropriately to supervisors and co-workers." (*See* Pl. Mem., at 18-19; R. at 316.) While it does not appear that Dr. Harding's opinion must necessarily be read as internally inconsistent,[33] I nonetheless recommend that, on remand, the ALJ be directed to clarify Dr. Harding's ultimate recommendation as to Plaintiff's RFC, in light of the consultant's Section I assessment.

---

[33] In Section I of the MRFCA, the "Summary Conclusions" section, Dr. Harding assessed Plaintiff's ability to perform 20 different mental activities, which were divided into five categories. (R. at 317.) The category entitled "Social Interaction," in turn, contained five different activities, including the ability to accept instructions and respond to criticism. (*Id.* at 316.) Dr. Harding assessed Plaintiff as having no significant limitations in four out of five of the activities in the Social Interaction category. (*Id.*) Reading all of Dr. Harding's opinions in Section I together with his ultimate RFC recommendation in Section III, it appears possible that Dr. Harding concluded that, overall, Plaintiff was capable of responding appropriately to supervisors and co-workers. Indeed, the "Social Security Administration's guidelines (the 'Program Operations Manual System,' or 'POMS') explain . . . [that] 'Section I is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and *does not constitute the RFC assessment.*'" *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 636-37 (3d Cir. 2010) (quoting POMS DI 24510.060, *available at* https://secure.ssa.gov/poms.nsf/links/0424510060) (emphasis added) (collecting cases).

**c.      The ALJ's Inconsistent Reliance**
**on the Treating Doctors' Reports**

In her reply brief, Plaintiff also takes issue with the ALJ's seeming reliance on certain

portions of the November 2009 joint report by Drs. Bathija and Breslau, and rejection of other

parts.  Specifically, Plaintiff points to the ALJ's citation to the opinions of these doctors for the

propositions that, for example, Plaintiff had improved with medication, and that her mental-

status examinations showed normal findings for memory, attention, and concentration.  (Pl.

Reply Mem., at 12-13.)  Plaintiff argues that the ALJ committed legal error by relying on

portions of the doctors' reports that were favorable to his conclusion and disregarding the parts

of the report where the doctors had opined that Plaintiff was still not stable, was experiencing

symptoms, and had functional limitations.  (*Id.* at 13.)

It is unclear whether the ALJ cited certain portions of the treating doctors' reports (a) as

demonstrative of the inconsistencies within and/or between their reports, or (b) to support his

RFC findings, even though he ultimately rejected the doctors' opinions, contained in those same

reports, on the nature and degree of Plaintiff's impairments.  To the extent that the ALJ's intent

was the former, this would merely show that he perceived inconsistencies in the treaters' reports,

which, as already discussed above, would have obligated him to "seek out more information

from the [treaters] and to develop the administrative record accordingly."  *Hartnet*,

21 F. Supp. 2d at 221.  To the extent his intent was the latter, he erred by substituting his opinion

for that of the medical professionals.  *See Shaw v. Chater*, 221 F.3d 126, 134-35 (2d Cir. 2000)

("Neither the trial judge nor the ALJ is permitted to substitute his own expertise or view of the

medical proof for the treating physician's opinion.").  I recommend that, on remand, the ALJ be

directed to clarify these issues.

58

**d.    The ALJ's Failure To Make a Thorough
and Explicit Determination of the Weight
to Which the Treaters' Opinions Were Entitled**

Finally, Plaintiff argues that the ALJ did not properly consider all relevant factors in determining the amount of weight to accord the opinions of Plaintiff's treaters.  As set out above, where an ALJ does not grant controlling weight to the opinions of treating sources, the "ALJ must apply a series of factors in determining the weight to give such an opinion."  *Aronis*, 2003 WL 22953167, at *5.  While, in this case, the ALJ acknowledged the factors applicable to this determination (*see* R. at 18-20), he did not fully consider at least one of them – the consistency of the treaters' opinions with the record as a whole.  In this regard, the ALJ stated that he found the treaters' opinions "grossly [to] overstate [Plaintiff's] limitations" and not to be "supported by substantial evidence."  (*Id*. at 20.)  The ALJ further stated that, while he found some of Plaintiff's claimed mental limitations to be "credible," there was "no indication" in the record that Plaintiff "would be absent so often or would be unable to work even with limited interactions with supervisors and peers."  (*Id*.)  In making these conclusory findings, the ALJ failed to explore the extent to which multiple aspects of the treaters' stated opinions were consistent with the overall record.

In addition, the ALJ erred by failing to make an explicit conclusion, in light of all the evidence, as to the weight to which Dr. Bathija's and Dr. Breslau's opinions were entitled. Regardless of whether the ALJ adopted the limitations set out in these doctors' functional assessments, the ALJ was required to make an explicit finding as to what weight he was giving their opinions.  *Aronis*, 2003 WL 22953167, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)).

On remand, the ALJ should be directed to remedy these errors.

### C.       The ALJ's Residual Functional Capacity Determination

Plaintiff makes a number of additional arguments challenging the ALJ's assessment of Plaintiff's RFC as not supported by substantial evidence and/or legally flawed.  On this subject, Plaintiff argues that (1) the ALJ took inconsistent positions at different parts of his decision with respect to whether Plaintiff was significantly limited in her ability to engage in social interaction, whether Plaintiff would be regularly absent from work, and whether she was able to travel (*see* Pl. Mem., at 5-8, 8-9); (2) the ALJ failed to acknowledge relevant findings by Dr. Meadow and by Drs. Bathija and Breslau regarding Plaintiff's functional capacity (*see id.* at 8-9); (3) the ALJ placed excessive reliance on Plaintiff's GAF scores (*id.* at 10-12); and (4) there was not substantial evidence in the record to support the ALJ's conclusion that Plaintiff would be able to perform the standing/walking components of light work (*id.* at 19).  Some of these arguments, at least to some extent, provide further ground for remand.

### 1.       Alleged Inconsistencies Between the ALJ's Mental        RFC Findings and Other Portions of the ALJ's Decision

#### a.       Plaintiff's Restrictions on Social Interaction

Plaintiff contends that the ALJ erred by finding, at step three, that Plaintiff had "substantial limitations" in the domain of social functioning, but by then rejecting, at step four, specific assessments by Drs. Bathija and Breslau that Plaintiff was unable to meet competitive standards in certain areas within this domain.  (*Id.* at 5-8.)  Plaintiff also contends that the ALJ erred by failing to incorporate, into his RFC determination, that Plaintiff was limited in her ability to interact with supervisors and workplace peers.  While this Court does not find that the ALJ's decision was necessarily flawed in this respect, the Court would benefit from a

clarification by the ALJ of his opinion as to the extent of Plaintiff's limitations in social functioning.

At step three, in deciding whether a claimant's severe mental impairment meets or equals any of the criteria set out in the governing regulations, the ALJ must consider the degree of limitation that the claimant has in his or her activities of daily living, social functioning, and concentration, persistence or pace. *See* 20 C.F.R. § 416.920a. Here, in doing the required analysis at step three, the ALJ concluded that, overall, Plaintiff had "mild" restrictions on "activities of daily living," "moderate" difficulties with "social functioning," and "moderate" difficulties with "concentration, persistence, or pace." (R. at 16.) The ALJ provided examples from the record in support of each finding. With respect to social functioning, the ALJ noted that Plaintiff did "not enjoy being around others," would "grocery shop early in the morning to avoid others," would not "use public transportation on her own or in rush hour," and was "angered easily." (*Id.* at 16.) Plaintiff argues that, having made these findings (which Plaintiff characterizes as findings of "substantial limitations" in Plaintiff's social functioning), it was inconsistent for the ALJ then (1) to go on to reject the assessments by Drs. Bathija and Breslau that Plaintiff was unable to meet competitive standards in the areas of (a) accepting instruction and responding appropriately to criticism from supervisors, and (b) getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes (Pl. Mem., at 5-7), or (2) to go on to reject entirely the limitations found by these practitioners and find that Plaintiff did not have *any* limitations on her ability to interact with supervisors or co-workers (*id.* at 5-7).

On these points, it should first be noted that, contrary to Plaintiff's repeated contentions, the ALJ did *not* find, at step three of the sequential analysis, that Plaintiff had "substantial

limitations" in social functioning.  Rather, the ALJ only found that Plaintiff had "moderate"

difficulties in overall social functioning.[34]  (R. at 16.)  For this reason, the ALJ's findings at step

three were not inconsistent with the ALJ's rejection, at step four, of the treating doctors'

opinions that Plaintiff was "unable to meet competitive standards" on tasks within this domain.

(*See id*. at 20, 344.)  According to the definitions provided by the SSA, *"marked"* limitations are

comparable to, at the very least, an inability "to meet competitive standards," but *"moderate"*

limitations are defined as less than "marked" limitations.[35]  Thus, the ALJ's finding that Plaintiff

had "moderate" limitation in social functioning was actually consistent with the ALJ's rejection

of the treating doctors' opinions that Plaintiff was unable to meet competitive standards in

certain areas of social functioning.[36]

Plaintiff also contends that the ALJ's finding at step three that Plaintiff had moderate

limitations in social functioning should have led the ALJ to conclude in his RFC determination,

at step four, that Plaintiff had at least some limitations in the areas of interacting with supervisors

---

[34] This conclusion was consistent with both Dr. Harding's and Drs. Bathija's and Breslau's assessments that, overall, Plaintiff had "moderate" limitations in social functioning. (*See* R. at 311, 343.)

[35] *Compare id.* at 343 (explaining that moderate limitations are less than "marked" limitations, and "marked" limitations occur where at least one activity or function is so impaired as to "*seriously* interfere with the ability to function independently, appropriately, effectively, and on a sustained basis") (emphasis added) *with id.* at 344 (defining the category for "[u]nable to meet competitive standards" as meaning the patient "cannot satisfactorily perform [the] activity independently, appropriately, effectively and on a sustained basis in a regular work setting").

[36] In addition, although Plaintiff challenges the ALJ's determination that Plaintiff could engage in direct customer service for up to a third of a workday (*see* Pl. Mem. at 8; R. at 48), this was also consistent with the ALJ's finding that Plaintiff had only "moderate" limitations in social functioning – *i.e.*, limitations that would not "seriously interfere" with her ability to perform the tasks in question on a sustained basis.  (*See supra* at n.34.)

and co-workers.  (Pl. Mem., at 7.)  More specifically, Plaintiff points to the ALJ's statement,
made by the ALJ in the context of rejecting Drs. Bathija's and Breslau's opinions, that "there is
no indication that Claimant would . . . be unable to work *even with limited interactions with
supervisors and peers*" (*id.* at 9 (citing R. at 20) (emphasis added)), arguing that this language
itself suggests a "finding" by the ALJ that Plaintiff was impaired in her ability to interact with
supervisors and peers, which then should have been incorporated into the ALJ's RFC
determination (*id.*; *see also* Pl. Reply Mem., at 2 (citing *Ramirez v. Barnhart*, 372 F.3d 546, 555
(3d Cir. 2004)).

The ALJ, however, never made any explicit step-three finding that Plaintiff was limited
in her ability to relate to supervisors or peers, and his RFC determination, at step four, comported
with the limitations in social interaction that he did expressly find.  In this respect, the ALJ
appropriately determined that Plaintiff was functionally limited to employment that involved
"superficial interaction with the public and only occasional direct customer service interaction."
(R. at 15-16.)  This determination was entirely consistent with the ALJ's step-three findings that
Plaintiff did not enjoy being around others, grocery shopped early in the morning to avoid other
people, and avoided public transportation at rush hour.  (*Id.* at 16.)  It was also supported by
evidence in the record that Plaintiff generally avoided situations where she had to be around a lot
of other people, and that, if she became aggressive, it was towards customers or members of the
general public.  (*See* R. at 32, 199, 323.)  Plaintiff herself testified that, while, in her past work,
she had gotten into fights with the customers, she had not had problems with supervisors.  (*Id.* at
29, 32.)  She also apparently told Drs. Bathija and Breslau that she had not had problems with
co-workers or supervisors at her past jobs.  (*Id.* at 323.)  Indeed, Drs. Bathija and Breslau
explained, in their November 2009 report, that Plaintiff had reported that she could be "easily

angered and . . . provocative in *public settings* when [she] perceive[d] others [were] staring at her."  (*Id.* at 322.)  Especially in light of this evidence, nothing in the ALJ's step-three findings dictated that the ALJ was required to find that Plaintiff had limitations in dealing with supervisors and peers.

Despite this, however, the Court does agree with Plaintiff that the ALJ's statement that "[w]hile some mental limitations are credible, there is no indication that the claimant . . . would be unable to work even with limited interactions with supervisors and peers" (*id.* at 20) is confusing.  Accordingly, on remand, I recommend that the ALJ be directed to clarify, in both his underlying findings and RFC determination, whether, in addition to her limitations in dealing with the public, Plaintiff also has any limitations in her ability to interact with supervisors and peers.  To the extent the ALJ finds, on remand, that Plaintiff does have such additional limitations, I further recommend that he be directed to set forth the evidentiary basis for his findings.

### b.   Plaintiff's Absences From Work

In response to the July 2010 opinion of Drs. Bathija and Breslau that Plaintiff would be absent from work an average of four days a month, the ALJ noted that "there is no indication that the claimant would be absent so often."  (Pl. Mem., at 9-10.)  Plaintiff argues that the ALJ's statement illustrates that the ALJ implicitly agreed that Plaintiff would have *some* number of absences from work.  (*See id.*)  Yet, on its face, the ALJ's statement merely indicated that there was no evidence in the record to support the doctors' stated opinion.  Plaintiff's suggestion that the ALJ was actually acknowledging some lesser amount of likely absenteeism is speculative and not a persuasive basis for remand.

### c.      Plaintiff's Ability to Travel

More persuasive is Plaintiff's argument that the ALJ's RFC analysis should have addressed any limitations in Plaintiff's ability to travel to and from a job.  (See Pl. Mem., at 7.)  There seems to be conflicting evidence in the record on the question of whether Plaintiff was able to travel,[37] and the ALJ did not make clear how he was resolving the seeming conflicts.  Rather, at step three, the ALJ merely noted that Plaintiff would not use public transportation "on her own or in rush hour" (*see* R. at 16), and then, at step 4, his RFC determination was silent on the point.  I recommend that, on remand, the ALJ be directed to explain his resolution of the evidence regarding Plaintiff's ability to travel for purposes of employment, and to clarify whether his RFC determination includes any restrictions in this regard.  *See* 20 C.F.R. § 416.913(c)(1) (identifying the ability to travel as a work-related activity).

### 2.      The ALJ's Reliance on Plaintiff's GAF Scores

Plaintiff also argues that the ALJ erroneously placed too much emphasis on Plaintiff's GAF scores of 65 and 71 in his analysis of Plaintiff's RFC.  (Pl. Mem., at 10-12.)  It appears, however, that the ALJ reasonably considered the reported GAF scores, which were relevant to the ALJ's RFC finding, as one factor among the rest of the relevant evidence, including Plaintiff's mental status evaluations, the doctors' statements regarding Plaintiff's progress on her

---

[37] Plaintiff appears to have provided different answers to the question of whether she could use public transportation.  (*Compare* R. at 199 (indicating on SSA disability form that she uses public transportation and can go out alone); 229, 261 (F.E.G.S. form indicating Plaintiff has no travel restrictions); *with* 283 (statement to consultative examiner that she was driven to appointment by a friend and she avoids public transportation because of panic attacks); *with* 323 (joint report by Drs. Bathija and Breslau indicting that Plaintiff was "able to take public transportation, but reports some paranoia and panic attacks, easily angered, [and] can be provocative in public settings when perceives others staring at her").)

medication and treatment, and Plaintiff's testimony.  There is no indication that the ALJ placed undue weight on the scores alone, except to the extent that he may have relied on those scores to substitute his own opinion for those of Plaintiff's treating doctors, a point addressed above.  (*See supra*, at Discussion, Part III(B)(2)(c).)[38]

### 3.   Evidence the ALJ Failed To Address

Plaintiff's final argument regarding the ALJ's RFC determination is that the ALJ erred by failing to acknowledge certain relevant evidence in the record.  (Pl. Mem., at 8.)  Although the ALJ is not required to address and reconcile "every ambiguity and inconsistency of medical testimony," courts have held that "[an] ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error."  *Pagan v. Chater*, 923 F. Supp. 547, 557 (S.D.N.Y. 1996).

On this point, Plaintiff first argues that the ALJ's RFC determination failed to take account of Dr. Meadow's opinion that Plaintiff might have difficulty dealing with job-related stress.  The Court has already addressed this topic above, in the context of Plaintiff's argument regarding the supposed consistency of this aspect of Dr. Meadow's opinion with the opinions of Plaintiff's treating psychiatrist and psychologist.  (*See supra*, at Discussion, Part III(B)(2)(a).)  It should be added, however, that if, on remand, the ALJ again decides to accord "great" weight to Dr. Meadow's opinion, then the ALJ should not only be directed to elicit additional information from Dr. Meadow regarding Plaintiff's ability to handle workplace stress (*see id.*), but should

---

[38] To the extent Plaintiff argues that the GAF scores cited by the ALJ, at step three, were indicative of "moderate" limitations, her argument appears to miss the fact that the ALJ's RFC was itself compatible with "moderate" limitations, as discussed above.  (*See supra*, at Discussion, Part III(c)(1).)

also be directed to modify his RFC determination, as appropriate, if he finds that newly elicited information warrants a finding of additional limitations.

Plaintiff also argues that the ALJ failed to acknowledge a number of findings reported by Drs. Bathija and Breslau, including that Plaintiff was "seriously limited, but not precluded" from functioning in the following areas:  (1) maintaining attention for two hour segments; (2) performing at a consistent pace without an unreasonable number and length of rest periods; (3) and dealing with normal work stress.  (Pl. Mem., at 9 (citing R. at 344).)  If, on remand, the ALJ determines that the reports of these treating sources should be accorded some weight, then the ALJ should be directed to reconcile their findings with his RFC determination, so that the Court will be able to assess the extent to which his conclusions are supported by substantial evidence.  *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983).

### 4. <u>The ALJ's Finding that Plaintiff Could Perform "Light" Work</u>

Plaintiff also challenges the exertional limitations adopted by the ALJ as part of his RFC determination.  In considering limitations caused by Plaintiff's physical impairments, the ALJ apparently relied on the opinion of Dr. Akresh, who, in relevant part, opined that Plaintiff had "mild limitations in her ability to ambulate for long distances due to osteoarthritis of the knees." (R. at 290.)  The ALJ reasoned that this opinion "generally supported the other relevant evidence of record showing that [Plaintiff] ha[d] mild to moderate limitations with standing and lifting, most reasonably limiting her to light work."  (*Id.* at 20.)  Pointing to the definition of "light work" contained in the applicable regulation, *see* SSR 83-10 (providing that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8 hour workday"), Plaintiff argues that the ALJ's determination that she was physically capable of

the full range of "light" work, except for certain postural limitations and environmental restrictions, was not supported by Dr. Akresh's report.

Specifically, Plaintiff argues that Dr. Akresh's opinion did not support the ALJ's conclusion that Plaintiff could walk for 6 hours a day because the word "mild," as used by the doctor, was too vague and "did not impart any useful information that would allow one to quantify just how long plaintiff can . . . walk."  (Pl. Mem., at 20 (citing *Curry v. Apfel*, 209 F.3d 117 (2d Cir. 2000).)  Plaintiff also argues that Dr. Akresh's opinion was silent as to how long Plaintiff could stand, and thus the ALJ could not have relied on Dr. Akresh's opinion to support a determination on that issue.  (*Id.* (citing *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638 (2d Cir. 1983).)

Plaintiff's arguments with respect to Dr. Akresh's opinion are well taken, and, as the ALJ did not appear to rely on any other evidence to support his conclusions regarding Plaintiff's ability to perform the full range of "light" work, I recommend that, on remand, the ALJ be directed to remedy any ambiguities in the record and in his RFC determination, regarding the extent of Plaintiff's ability to stand and walk.  *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.").[39]

---

[39] In his decision, the ALJ did not cite to the Physical Residual Functional Capacity Assessment completed by the state agency consultant N. Wade-Hull, but the Court notes that, if the ALJ were to rely on that assessment on remand, he should first clarify Wade-Hull's credentials.  As the record stands, there is no indication as to the nature of either Wade-Hull's credentials or expertise.  (*See id.* at 300 (form bearing Wade-Hull's name, but in which the space for "Medical Consultant's Code" has been left blank; *see Popock v. Astrue*, 374 F. App'x 903,

D.        **The ALJ's Step-Five Determination**

As set out above (*see supra*, at Discussion, Part I(B)), where a claimant suffers from non-exertional impairments, an ALJ may be required to consult with a vocational expert, in order to determine whether the claimant is capable of working.  As part of this consultation, an ALJ may describe to such an expert a set of functional and vocational characteristics (including any exertional and non-exertional restrictions), and ask the expert, in hypothetical terms, whether jobs exist that could be performed by a person with such characteristics.  Provided that the characteristics described in the hypothetical question accurately reflect the limitations and capabilities of the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.  *See Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Aubeuf*, 649 F.2d at 114.  A hypothetical question posed to a vocational expert "need not frame the claimant's impairments in the specific diagnostic terms used in the medical reports, but instead should capture the concrete consequences of those impairments." *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (internal citation omitted).  Where, however, a hypothetical question fails, even in lay terms, to incorporate medical evidence about a claimant's particular mental impairments, the resulting expert testimony cannot constitute substantial evidence about what work the claimant may be able to perform.  *See Salazar de Velez v. Astrue*, No. 09 Civ. 6246 (DAB) (RLE), 2010 WL 6865686, at *9-10 (S.D.N.Y. Dec. 22, 2010), *report and recommendation adopted by* 2011 WL 2671545, at *1 (S.D.N.Y. July 6, 2011).

---

905 (11th Cir. 2010) (noting that assessments filled out by non-examining agency medical consultants failed to specify whether the consultants were doctors).)

For her final arguments, Plaintiff contends that, in her case, the ALJ's determination at step five was deficient because (1) the ALJ asked the vocational expert a flawed hypothetical question (Pl. Mem., at 20-22), and (2) the vocational expert's testimony, in response, conflicted with the DOT (*id.* at 22-23).

### 1.      The Hypotheticals Posed by the ALJ to the Vocational Expert

Plaintiff first argues that the hypothetical questions posed by the ALJ to the vocational expert were based on an erroneous RFC finding.  (*See* Pl. Mem., at 21.)  On this point, it is self-evident that, if the ALJ were to modify his RFC determination on remand, then the ALJ should make any corresponding changes to the hypotheticals posed to the vocational expert.  *See Calabrese*, 358 F. App'x at 276 (holding that, for an ALJ to rely on a vocational expert's testimony regarding a hypothetical "as long as the facts of the hypothetical . . . accurately reflect the limitations and capabilities of the claimant involved."  (citations omitted)).  Accordingly, I recommend that this be part of the direction given to the ALJ in connection with any remand.

Plaintiff's second argument, relating to the adequacy of a particular hypothetical question posed by the ALJ to the vocational expert, also warrants further instruction to the ALJ, especially if the record is further developed on remand.  Plaintiff contends that the ALJ's hypothetical, by which he asked the expert about work that could be performed by someone with the ability to "understand, remember, and carry out simple instructions" and "make judgments on simple work related decisions" (R. at 46), did not adequately capture the ALJ's finding, at step three, that Plaintiff had "moderate difficulties in maintaining concentration, persistence, or pace" (*see* Pl. Mem., at 21).[40]  While the Second Circuit has not directly addressed the issue of whether "an

---

[40] Given that the scope of the underlying record may change on remand, I do not recommend that Plaintiff's challenge to this hypothetical question be rejected on the procedural

ALJ's hypothetical question to a vocational expert must specifically account for limitations in concentration, persistence and pace, other courts that have addressed the issue have answered in the affirmative." *McIntyre v. Colvin*, No. 3:12-CV-0318 (GTS), 2013 WL 2237828, at *4 (N.D.N.Y. May 21, 2013); *see also Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (collecting cases).  There is, however, no *per se* requirement that an ALJ's hypothetical questions must "expressly parrot the language of [the special technique outlined in] 20 C.F.R. § 404.1520a and 416.920a in all cases." *See Marquez*, 2013 WL 5568718, at *17. Thus, "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." *See id.* at *17 (quoting *Winschel*, 631 F.3d at 1180); *McIntyre*, 2013 WL 2237828, at *4 (same).

At this point, where the ALJ has not exhausted his obligation to develop the record, it is difficult for the Court to determine whether substantial medical evidence would support a determination that, regardless of any limitations in concentration, persistence, and pace, Plaintiff would be able to understand, remember, and carry out simple instructions, and to make judgments on simple work related decisions.  I thus recommend that, on remand, the ALJ be directed to ensure that all of Plaintiff's limitations are adequately reflected in the hypotheticals provided to the vocational expert.

---

ground that she failed to object to it at the time of the hearing.  (*See id.* at 26, 27, 39, 41, 43, 46, 50-54, 55; *see also Marquez v. Colvin*, No. 12 Civ. 6819 (PKC), 2013 WL 5568718, at *17 (S.D.N.Y. Oct. 9, 2013) (noting that plaintiff, who was represented by counsel at the administrative hearing and whose counsel cross-examined the vocational expert, failed to raise an objection to the ALJ's hypothetical to the vocational expert at the administrative hearing).)

## 2.    The Vocational Expert's Testimony
## <u>Regarding Jobs Plaintiff Could Perform</u>

Lastly, Plaintiff argues that, even if the ALJ's RFC finding and the hypotheticals the ALJ

provided to the vocational expert were appropriate based on the evidentiary record, the

vocational expert's responsive testimony as to the jobs that Plaintiff could perform was

unreliable because (1) the ALJ did not ask whether the expert's testimony was consistent with

the DOT, (2) the testimony, in fact, conflicted with the DOT, and (3) the testimony was based on

outdated numbers.  These arguments are not well founded.

As to the first of these arguments, Plaintiff is simply incorrect that the ALJ failed to ask

the vocational expert whether his testimony conflicted with the DOT (a question an ALJ is

supposed to ask, in accordance with a Social Security policy statement).  (*See* Pl. Mem., at 22;

SSR 00-4.)  On the contrary, the ALJ specifically asked the expert, Dr. Pearsall, to let him know

"if any of [the expert's] testimony diverts from the DOT."  (R. at 39.)  In addition, Dr. Pearsall

identified the DOT codes for each of the jobs about which he testified.  (*Id.* at 48.) [41]

Plaintiff second contends that, although the ALJ confirmed that "the vocational expert's

testimony [was] consistent with the information contained in the Dictionary of Occupational

Titles" (*id.* at 21), this was not actually the case.  On this point, Plaintiff argues that two of the

---

[41] In response to the ALJ's hypothetical questions, Dr. Pearsall testified that the
hypothetical individual could perform the jobs of sorter (which he identified as a job falling
under the DOT code 729.687-146); bench or light assembler (which he identified as falling under
DOT 706.687-010); and light or night housekeeper (which he identified as falling under DOT
323.687-014).  (R. at 48.)  Plaintiff has pointed out that, according to the hearing transcript, the
code given by the expert for a "sorter" was not an actual, existing DOT code (*see* Pl. Mem.,
at 23), but it appears that, in this regard, the transcript reflects either a minor misstatement by the
expert or a typographical error, and that the reference to code "729.687-146" should have been to
code "789.687-146," the correct DOT code for a "Remnant Sorter."

jobs identified by Dr. Pearsall – the jobs of (a) sorter, and (b) assembler (both of which were

categorized by the DOT as requiring General Educational Development ("GED") "level 2"

reasoning (*see* DOT 789.687-146; 706.687-010)) – could not have been performed by someone

with Plaintiff's RFC, as it was defined by the ALJ at the hearing.  (Pl. Mem., at 22-23.)

       Jobs associated with "GED level 2 reasoning" require an individual to "[a]pply

commonsense understanding to carry out detailed but uninvolved written or oral instructions"

and to "[d]eal with problems involving a few concrete variables in or from standardized

situations."  DOT, App'x C.[42]  Plaintiff contends that these criteria could not have been satisfied

by someone who could only "understand, remember, and carry out simple instructions" and

"make judgments on simple work related decisions" (R. at 46; *see* Pl. Mem., at 22-23), which is

how the ALJ described Plaintiff's abilities (R. at 46).  Yet, while some courts have found that "a

limitation to simple instructions or tasks conflicts with an indication in the DOT that a job has a

GED reasoning level of 2, these cases 'are increasingly in the minority.'"  *Carrigan v. Astrue*,

No. 2:10-CV-303, 2011 WL 4372651, at *10 (D. Vt. Aug. 26, 2011) (quoting *Pepin v. Astrue*,

No. 09-464-P-S, 2010 WL 3361841, at *2 (D. Me. Aug. 24, 2010)).  Most courts, in this circuit

and others, have held that an RFC that limits a claimant to only simple and routine tasks *is*

consistent with GED level 2 reasoning.  *See Jones-Reid v. Astrue*, 3:10-CV-1497, 2012 WL

7808094, at *26 (D. Conn. May 14, 2012); *see also Edwards v. Astrue*, No. 5:07-CV-898

(NAM/DEP), 2010 WL 3701776, at *15 (N.D.N.Y. Sept. 16, 2010) (citing cases from other

circuit courts of appeals); *Carrigan*, 2011 WL 4372651, at *10-11 (same).  Based on the weight

---

[42] In contrast, jobs associated with "GED level 1 reasoning" only require an individual to "[a]pply commonsense understanding to carry out simple one- or two-step instructions" and "[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job."  *Id.*

of the authority (and assuming that the ALJ's RFC determination was supportable, as Plaintiff does for purposes of this argument), this Court cannot agree that there was conflict between the vocational expert's testimony that Plaintiff could perform certain "sorter" and "assembler" jobs, and the DOT descriptions of those jobs.

Plaintiff also contends that Dr. Pearsall's testimony that a person with Plaintiff's RFC could perform the job of a housekeeper was in conflict with the DOT requirements for that job. (Pl. Mem., at 24.)  In particular, Plaintiff argues that, while the ALJ found that she could only have direct customer service interaction for up to a third of a day (*see* R. at 17), the DOT describes a housekeeper position as involving the "rendering of personal assistance to patrons," *see* DOT 323.687-014; [43] *see also* Pl. Mem., at 24.  This element of the DOT description, however, did not render Dr. Pearsall's testimony inconsistent with the DOT job requirements. Certainly, there was no direct conflict, as the DOT does not specify the percentage of a day for which someone employed as a housekeeper would have to "render[] personal assistance to patrons."  Moreover, the record clearly shows that Dr. Pearsall took Plaintiff's limitations on social interaction into account when giving his testimony; for example, in response to a question by the ALJ, the expert testified that Plaintiff would not be able to do her past work as a cashier, sales clerk, or even garment hanger because that work could "potentially exceed" the occasional

---

[43] DOT 323.687-014 describes the job, in full, as:  "Cleans rooms and halls in commercial establishments, such as hotels, restaurants, clubs, beauty parlors, and dormitories, performing any combination of following duties:  Sorts, counts, folds, marks, or carries linens. Makes beds.  Replenishes supplies, such as drinking glasses and writing supplies.  Checks wraps and renders personal assistance to patrons.  Moves furniture, hangs drapes, and rolls carpets. Performs other duties as described under CLEANER (any industry) I Master Title.  May be designated according to type of establishment cleaned as Beauty Parlor Cleaner (personal ser.); Motel Cleaner (hotel & rest.); or according to area cleaned as Sleeping Room Cleaner (hotel & rest.)."

direct customer service limitation.  (R. at 49.)  The ALJ's hypothetical specifically included limitations on interaction with the public and customer service, and, in response, Dr. Pearsall testified that Plaintiff could perform the job of light or night housekeeper.  (*Id.* at 48-49.)  Given Dr. Pearsall's expertise as a vocational expert, the ALJ was entitled to rely on that testimony to support his finding that Plaintiff could perform the job of housekeeper.  *See Pena v. Astrue*, No. 07 Civ. 11099 (GWG), 2008 WL 5111317, at *10 (S.D.N.Y. Dec. 3, 2008) ("A '[vocational expert's] recognized expertise provides the necessary foundation for his or her testimony.'" (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005))).

Finally, Plaintiff argues that the ALJ was not entitled to rely on the vocational expert's testimony regarding the number of jobs that existed in the national and regional economy for each job, because the numbers provided by the expert were out of date.  (Pl. Mem., at 24-25.)  Dr. Pearsall testified that the jobs of sorter, bench or light assembler, and housekeeper, respectively, existed in the following numbers:  4,000 jobs in the region and 480,000 jobs nationally; 12,000 jobs in the region and over 1,000,000 jobs nationally; and over 25,000 jobs regionally and over 2,000,000 jobs nationally.  He explained that these numbers were based on the Occupational Index Classifications, a quarterly publication to which he subscribed (R. at 50), although he candidly testified that the numbers were probably three to four years old because the publication was always a few years behind in updating its information (*id.*).  Nonetheless, the job numbers to which Dr. Pearsall testified (collectively, 3,500,000 jobs nationally) were sufficiently high to enable the ALJ to rely on them, even if they were a few years old.  Further, Dr. Pearsall testified that he had participated in labor market surveys and that it was his view that there were "plenty of jobs," even if one were to adjust the numbers in some way to account for the passage of time.  (*Id.* at 54.)  Overall, the vocational expert's testimony constituted substantial evidence

to support the ALJ's finding that work existed in "significant numbers in the national economy."
20 C.F.R. § 416.969; *see Sullivan v. Astrue*, No. 08-CV-6355 (CJS), 2009 WL 1347035, at *15
n. 15 (W.D.N.Y. May 13, 2009) ("Even if the [vocational expert] had identified only one job that
existed in sufficient numbers, the Commissioner would have met his burden at the fifth step."
(citing *Bull v. Comm'r of Soc. Sec.*, No. 1:05-CV-1232 (LEK/RFT), 2009 WL 799966, at *6
(N.D.N.Y. Mar. 25, 2009))); *Henry v. Astrue*, No. 07 Civ. 0957 (WCC), 2008 WL 5330523, at
*10 (S.D.N.Y. Dec. 17, 2008) (finding that 1,208 jobs in the local economy constituted a
significant number).  Accordingly, although I recommend remand for all the reasons discussed
above, the Court should reject these last arguments raised by Plaintiff.

## **CONCLUSION**

For the forgoing reasons, I respectfully recommend that this matter be remanded, with a
direction to the ALJ:

(1)     to issue a follow-up request for the records of Drs. Bathija and Breslau, in
        accordance with 20 C.F.R. § 416.912(d)(1);

(2)     to develop the record to the extent necessary to clarify the aforementioned
        ambiguities in the reports of Drs. Meadow, Harding, and Akresh, as well as the
        agency consultant N. Wade Hull;

(3)     to disregard those portions of Dr. Harding's report that related to records of an
        individual other than Plaintiff;

(4)     to clarify his reliance on select portions of the reports of Drs. Bathija and Breslau,
        to make an explicit finding as to what weight he accords these doctors' opinions,
        and otherwise to evaluate these opinions in light of the factors listed in 20 C.F.R.
        § 416.927(c)(2);

(5)     to clarify his findings with respect to Plaintiff's ability to travel and interact with
        supervisors and co-workers;

(6)     to provide support for his findings, or any new finding, regarding any restrictions on Plaintiff's ability to function as a result of Plaintiff's severe impairments and to reconcile these findings with the opinion evidence on which he relies; and

(7)     to incorporate into hypothetical questions posed to a vocational expert all functional limitations that the ALJ finds Plaintiff to have, including any limitations caused by mental impairments.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura T. Swain, United States Courthouse, 500 Pearl Street, Room 755, New York, NY 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, NY 10007. Any requests for an extension of time for filing objections should be directed to Judge Swain. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
        April 4, 2014

                                        Respectfully submitted,


                                        DEBRA FREEMAN
                                        United States Magistrate Judge

77

Copies to:

Hon. Laura T. Swain, U.S.D.J.

All counsel (via ECF)